MUNICIPALITY OF ANCHORAGE,
Appellant/Cross–Appellee,

v.

Jack GALLION, John Young, Carroll Grant, Anthony Provost, Douglas K. Bohac, and Anchorage Police and Fire Retirees Association, Appellees/Cross–Appellants,

v.

BOARD OF TRUSTEES OF THE ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM, Cross–Appellee.

Nos. S–7331, S–7591.

Supreme Court of Alaska.

Aug. 15, 1997.

Susan Wright Mason and Bruce E. Gagnon, Atkinson, Conway & Gagnon, Anchorage, and George M. Newsham, Assistant Municipal Attorney, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellant/Cross–Appellee Municipality of Anchorage.

Peter J. Maassen, Ingaldson Maassen, P.C., Anchorage, and Peter Gruenstein, Gruenstein, Hickey & Stewart, Anchorage, for Appellees/Cross–Appellants.

Robert D. Klausner, Klausner & Cohen, P.A., Hollywood, Florida, and Parry Grover, Davis, Wright, Tremaine, Anchorage, for Cross–Appellee, Board of Trustees of the Anchorage Police and Fire Retirement System.

Before COMPTON, C.J., and RABINOWITZ and EASTAUGH, JJ.

*OPINION*

EASTAUGH, Justice.

## I. *INTRODUCTION*

Does Anchorage Ordinance (AO) 94–95, which amended the Anchorage Police and Fire Retirement System (APFRS), violate Alaska Constitution article XII, section 7 by diminishing or impairing "accrued benefits" of some APFRS members? The superior court concluded that it does, and granted summary judgment to APFRS members who brought a class action against the Municipality of Anchorage. The superior court also awarded attorney's fees to the class. We agree that AO 94–95 violates article XII, section 7. We remand for further proceedings regarding the attorney's fees award.

## II. *FACTS AND PROCEEDINGS*

### A. *Facts*

By ordinance adopted in 1968, the predecessor of the Municipality of Anchorage

(MOA) created the APFRS to provide disability, retirement, and death benefits to MOA's police and fire department employees. The ordinance is codified in Anchorage Municipal Code (AMC) 03.85.010–.290 (1993).[1]

The APFRS presently consists of three plans; each has different benefits and eligibility requirements. *See* AMC 03.85.100–.150 (Plans I and II); AMC 03.85.200–.290 (Plan III). Plan I became effective July 1, 1968. Its enrollment closed when Plan II became effective July 1, 1977. Plan II enrollment closed when Plan III became effective April 17, 1984. Except for a brief period in 1984 when members of Plans I and II could enroll in Plan III, a member of one plan could not enroll in a different plan. AMC 03.85.020.

Each plan was funded by contributions from its members and MOA. An independent actuarial evaluation of Plans I and II must be made no less frequently than every two years to determine the contributions required to "maintain Plans I and II as actuarially sound...." AMC 03.85.100(G). For Plan III, an independent actuarial valuation must be conducted every year. AMC 03.85.210(A).

Before passage of AO 94–95, AMC 03.85.100(C) required MOA to contribute "additional monies to [Plans I and II] in an amount to assure that the fund is at all times financially sound." In addition, AMC 03.85.210(B) states in part that "[i]f additional monies are necessary to assure that Plan III is financially sound at all times and the member's contribution rate has already been set at the maximum, then Anchorage shall be solely responsible for contribution of such additional monies."

The APFRS is a defined benefit system, paying retired members monthly retirement benefits of a specified percentage of their monthly compensation, multiplied by the number of years of credited service. AMC 03.85.110(A). Members of Plans I and II will receive 2.5% of their highest average monthly compensation multiplied by the number of years they were plan members. AMC 03.85.110(A), AMC 03.85.015(A). Payments of these retirement benefits are guaranteed for life. AMC 03.85.110(F).

The APFRS is administered by an eight-member Retirement Board; four members represent MOA, two members represent the Police Department, and two members represent the Fire Department. AMC 03.85.030–.040. The Board is the "final authority in all matters pertaining to the system" and is authorized to "recommend to the Assembly any changes to [the APFRS] that may become necessary to carry out the intent of [the APFRS]." AMC 03.85.040(A) & (F).

In February 1993 the Board adopted a "Statement of Investment Policy" for the APFRS. The statement announced this "Investment Goal":

> The investment of assets shall be accomplished with a view towards safety of principle [sic], and income from investments will be utilized to either reduce contributions, increase benefits or both.

The Board's statement adopted "Investment Objectives," one of which provided: "Maintain a maximum of 120% funding of the retirement systems pension benefit obligation over time." According to the APFRS executive director, since its inception all assets of APFRS "have been accounted for and invested as system assets. Actuarial valuations have been done to establish the liability for potential future benefits."

A review of the entire system[2] and its separate parts as of January 1, 1994, showed that Plan I was funded at 135%, with Plan I assets exceeding Plan "projected liability" by approximately $29,277,000.[3] It showed that

---

1. Unless specifically noted, the provisions of AMC 03.85 are the same as when the pertinent events took place.

2. "System" is defined at AMC 03.85.015(R) as "the retirement program described in this chapter, and may refer to Plans I and/or II and/or III as defined in Section 03.85.020 depending upon the context and the enrollment status of each particular member."

3. The actuary explained that "projected liability" represented "the actuarial present value of all projected benefits to be paid ... based on assumptions of future experience that represents our best estimate...." The report further explained that "the projections are inexact because

Plan II was funded at 112%, with Plan II assets exceeding Plan II projected liability by approximately $6,175,000. It also showed that Plan III was 89% funded, with projected liabilities exceeding assets by approximately $15,660,000. Based upon this evaluation, the actuary recommended that no further contributions be made to Plans I and II, but that MOA continue funding Plan III.

In May 1994 the Anchorage Assembly enacted AO 94–95 which amended two sections of the AMC governing the APFRS. Anchorage Ordinance 94–95 amended AMC 03.85.100(C) as follows:

> The Municipality of Anchorage, in addition to the payroll deductions of members, shall contribute additional monies to the [PLAN] *system* in an amount to ensure that the fund is at all times financially sound *but in no event shall the Municipality, nor the members, be required to contribute to the system if the Board's actuary determines that the funds necessary to pay the actuarial liability for the benefits for system members contained herein are available from the total assets of the system.*

(Additions are emphasized; deletions are bracketed.)

Anchorage Ordinance 94–95 also added a new section, codified as AMC 03.85.210(D), which governs Plan III and states:

> The Municipality of Anchorage, in addition to the payroll deductions of members, shall contribute additional monies to the system in an amount to assure that the fund is at all times financially sound, but in no event shall the Municipality, nor its members, be required to contribute to the system if the Board's actuary determines that the funds to pay the actuarial liability for benefits for system members contained herein are available from the total assets of the system. In the event that the Board's actuary determines that contributions are again required to meet the actuarial liability for benefits, then current employees who are members of Plan 3 of this system

and the Municipality shall make contributions in the ratio as set forth in 03.85.210(B).

In July 1994 MOA sent a memorandum to all APFRS members explaining that the Anchorage Assembly had amended AMC 03.85 to provide that "no employee or employer contributions to the Police and Fire Retirement System would be required if the actuary for the System determined that sufficient funds were available to pay the actuarial liability for the benefits." The memorandum also stated that the actuary for the APFRS had determined that the system "when taken as a whole" was overfunded by "about" twenty million dollars. It concluded by stating that as of the pay period ending July 24, 1994, there would be no more employer or employee contributions to Plan III. Based on the actuarial soundness of Plans I and II, the Board had suspended employee and employer contributions to those plans before passage of AO 94–95. Although Plan III was only 89% funded, and its projected liability exceeded its assets by approximately $15,660,000, the 1994 amendments to the AMC allowed MOA to suspend contributions to that plan, because the asset value of the entire system as a whole was projected to be 104% or 102% (depending on whether there were new Plan III entrants) of its projected liability.

## B. *Proceedings*

Six APFRS members sued MOA on behalf of "a class" consisting of active and retired members of Plans I and II.[4] The second amended complaint pled various causes of action against MOA, APFRS, and four unnamed APFRS Board members; it included claims based on federal and state constitutional violations and breach of contract. The class sought summary judgment on the theory that funds were diverted from Plans I and II, thus violating Alaska Constitution article XII, section 7 by impairing or diminishing the APFRS's ability to enhance benefits for

they are based on assumptions which are themselves necessarily inexact, even though we consider them reasonable."

4. The Board filed a declaratory judgment action against the class and MOA. The Board's action was consolidated with the action brought by the class.

Plan I and II members and by weakening the financial integrity of Plans I and II.

The superior court granted the class summary judgment against MOA, but denied summary judgment against the Board. A judgment declared that AO 94–95 violated Alaska Constitution article XII, section 7, and that AO 94–95 was null and void to the extent it amended AMC 03.85.100(C). The superior court also ordered that all funds "transferred from Plans I and II of the [APFRS] be restored to those Plans."

MOA appeals the superior court's grant of summary judgment, and asks that the trial court be instructed to enter summary judgment for MOA. MOA and the class both appeal from the court's award of full "actual" attorney's fees to the class.

### III. DISCUSSION

#### A. The Constitutionality of AO 94–95

##### 1. Constitutional standard

Alaska Constitution article XII, section 7 protects "accrued benefits" of public employee retirement systems from diminution or impairment.[5]

In granting summary judgment to the class and finding AO 94–95 violated Alaska Constitution article XII, section 7, the superior court held that the members of Plans I and II had a vested interest in the surpluses generated by their plans. It reached that conclusion given the historically distinct structure of the plans, the lack of notice to members of Plans I and II that a surplus would "essentially be donated" to subsidize contributions to a successor plan covering "a distinct population of recent hires," and the APFRS Board's 1993 Statement of Investment Goal in which each plan's respective membership could expect that "the benefits flowing from the increasing strength of each

plan would be preserved for the benefit of the membership of that plan." The court further noted that even though Board recommendations are only advisory, it was "unlikely" the Assembly would ignore a recommendation to increase benefits. The court also recognized that "it cannot be denied that the retention of surplus assets enhances the integrity of a plan, a condition clearly more favorable to its members than the dilution effected by AO 94–95."

MOA argues that the accumulated surpluses in Plans I and II gave the members of those plans no "accrued benefits," because the rights of plan members were determined when they enrolled, and the plans did not entitle the members to any distribution of accumulated surpluses. Instead, because Plans I and II were defined benefit plans whose benefits were guaranteed by MOA if employee contributions fell short, plan members could not reasonably expect to receive any portion of any accumulated surplus. MOA further argues that the superior court erred in relying upon the 1993 APFRS Statement of Investment Policy, which was not binding on MOA and created no rights beyond those specified in AMC 03.85. MOA asserts that the superior court's ruling that the class members had vested rights in "the surpluses generated by their plans" and the related "possibility of increased benefits" is inconsistent with the precedent established by this court. It concludes that AO 94–95 does not diminish or impair any "accrued benefit."

■■■ *Hammond v. Hoffbeck*, 627 P.2d 1052 (Alaska 1981), set out a framework for analyzing a claim alleging a violation of article XII, section 7 of the Alaska Constitution.[6] In *Hoffbeck*, we held that the right to benefits vests when the employee enrolls in the retirement system, rather than when the em-

---

**5.** Article XII, section 7 of the Alaska Constitution states:

> Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.

**6.** The constitutionality of a municipal ordinance is a question of law on which we exercise our

independent judgment. *Municipality of Anchorage v. Anchorage Police Dep't Employees Ass'n*, 839 P.2d 1080, 1083 n. 7 (Alaska 1992). When possible, we must "construe statutory provisions in such a way as to avoid unconstitutionality rather than simply void them on the basis of an interpretation which renders them constitutionally infirm." *Hammond v. Hoffbeck*, 627 P.2d 1052, 1059 (Alaska 1981).

ployee is eligible to receive the benefits. *Id.* at 1056–57. Changes in a system that operate to an employee's disadvantage by diminishing or impairing vested rights[7] must be offset by comparable new advantages, or the changes will run afoul of article XII, section 7. *Id.* at 1057 (citing *Allen v. City of Long Beach,* 45 Cal.2d 128, 287 P.2d 765, 767 (1955)).

In *Hoffbeck,* amendments to the statutory scheme underlying the Alaska Public Employees' Retirement System (PERS) reduced members' occupational death and disability benefits, and excluded some persons who were previously eligible for disability benefits. *Id.* at 1053–54. We there held that the vested benefits protected by article XII, section 7 include "not only the dollar amount of the benefits payable, but the requirements for eligibility [for benefits] as well." *Id.* at 1058.

We next considered article XII, section 7 in *Sheffield v. Alaska Public Employees' Ass'n,* 732 P.2d 1083 (Alaska 1987). In *Sheffield,* members of the PERS retirement system challenged the PERS Board's adoption of new actuarial tables, which reduced the benefits received by early retirees. *Id.* at 1084. In holding that using the new actuarial tables violated the employees' constitutional rights, we made it clear that the benefits in force at the time of enrollment in the system will be protected, stating:

> [A member] is entitled to have the level of rights and benefits then in force *preserved in substance in his favor without any modification downwards.* ... When we speak of the level of rights and benefits protected by [this statute] we mean the *practical effect of the whole complex of provisions....*

*Id.* at 1087 (quoting *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320, 327 (1973) (emphasis added)).

Citing the quoted language, the parties now before us disagree over what constitutes the "practical effect of the whole complex of provisions" regarding the APFRS. The class contends that prior to AO 94–95 the practical effect of the whole complex of provisions was "separate financial integrity" and "the prospect of increased benefits to each plan's membership from its own surplus generated from the investment of its own, separate, employer and employee contributions." In support, the class relies upon (1) the Board's 1993 investment goal of using income generated from investments of the funds to "reduce contributions, increase benefits or both" and (2) the "separateness" of the plans, i.e., their separate contribution rates, membership, and accounting.

MOA, however, asserts that under *Sheffield,* benefits are defined as the "practical effect of the statutory provisions" in force at the time of enrollment and do not encompass "possibilities" that may exist. In support, MOA also cites *Flisock v. State, Division of Retirement and Benefits,* 818 P.2d 640 (Alaska 1991); *Rice v. Rice,* 757 P.2d 60 (Alaska 1988); and *State v. Allen,* 625 P.2d 844 (Alaska 1981).

We held in *Flisock* that although an employee had the right to the benefits provided by statute when he enrolled in his retirement system, the employee had no vested right in the Retirement Division's mistaken application of the statutory provisions. 818 P.2d at 644 n. 5. We held in *Rice* that the use of a Qualified Domestic Relations Order (QDRO) to divide an employee spouse's pension benefits simply changed the method of distribution, and therefore did not impair vested rights because it did not reduce the dollar amount of monthly pension benefits. 757 P.2d at 62.

The parties disagree about the effect of the discussion of "vested rights" in *State v. Allen,* 625 P.2d at 847–48 & n. 5 (quoting 3A A. Corbin, *Corbin on Contracts* § 626, at 10–11 (rev. ed. 1960)). *Allen* upheld the right of those enrolled in the Elected Public Officers' Retirement System (EPORS) to receive, upon retirement, the benefits promised under the EPORS statute although the statute was repealed by initiative only eight months after the statute was implemented. *Id.* at

---

7. The phrase "accrued rights" in article XII, section 7 of the Alaska Constitution is synonymous with "vested rights." *Hoffbeck,* 627 P.2d

at 1055 n. 4 (citing *Bidwell v. Scheele,* 355 P.2d 584, 586 (Alaska 1960)).

849. Quoting Corbin, we distinguished between a "vested right" and an "expectancy":

> [T]he existence of a "contract right" is not denied merely because the money is payable in the future and only on the happening of an uncertain event or because some one has a power of termination or modification. If a right has to be "vested" in order to be recognized and protected, these rights are vested. It is immaterial whether the parties "expect" or "hope" that payment will take place.

*Id.* at 847–48 n. 5 (quoting Corbin, § 626, at 10–11).

Relying on *Allen*, MOA argues that the prospect of a future increase of benefits is only an "expectancy" rather than a vested right because no increase was ever promised. The class argues that an enforceable promise can be for something other than the payment of money; it asserts that the promise could be to invest wisely the retirement assets with the understanding that the proceeds, while presently undetermined, may only be used to benefit those who made the initial investment.

■ These three cases reaffirm the principle espoused in *Hoffbeck,* that an employee's right to retirement benefits vests upon his or her enrollment in the retirement system. MOA argues that under Alaska law, not all changes in a retirement system unconstitutionally diminish "accrued benefits." We agree with that general proposition, but it does not resolve the question presented here.[8]

### 2. *Analysis*

Our review of AMC 03.85 leads us to conclude that the APFRS treated the plans (as they were successively adopted) as distinct for all significant purposes. They had distinct contribution requirements (which became less favorable to the members of each newly added plan).[9] They provided distinct and different benefits to members of each plan.[10] Further, AMC 03.85.100(G) required an independent actuarial evaluation of Plans I and II every two years.[11] That provision

---

**8.** We deal here only with the constitutionality of AO 94–95. We express no opinion about any of the other possible grounds for relief.

**9.** For Plan I, a member's monthly contribution may not exceed 6% of his or her gross monthly compensation. AMC 03.85.100(A). For Plan II, a member's monthly contribution is based on an actuary's evaluation of the percentage required to maintain the system as actuarially sound. AMC 03.85.100(A), (G) & (H). For its first year, the Plan II contribution was 6.89%. AMC 03.85.100(H). Under Plan III, a member's maximum contribution rate is set by the APFRS Retirement Board every five years, and the actual rate may be reduced or increased at any time during that five year period so long as the contribution requirement does not exceed the maximum rate set. AMC 03.85.210(B). At inception, the Plan III contribution rate was 12%. AMC 03.85.210(A).

**10.** Members of Plans I and II will receive 2.5% of their total compensation during three consecutive calendar years of credited service which yield the highest average monthly compensation multiplied by the number of years they were plan members. AMC 03.85.110(A), AMC 03.85.015(A). Payments of these retirement benefits are guaranteed for life. AMC 03.85.110(F). Apart from the payroll deductions, MOA must "contribute additional monies to the plan in an amount to assure that the fund is at all times financially sound." AMC 03.85.100(C). Members of Plans I and II are eligible for "voluntary normal" retirement benefits upon completion of twenty years of total credited service. AMC 03.85.110(A). Members are also eligible for "voluntary early" retirement benefits after attaining age fifty-five with a minimum of five years of credited service. AMC 03.85.110(B).

Members of Plan III will receive 2.5% of their average compensation during the last fifty-two biweekly pay periods, or any two consecutive tax years, whichever results in the highest average amount, multiplied by the number of years of credited service. AMC 03.85.200(J), AMC 03.85.220(H). Plan III members are eligible for "normal service" retirement benefits after completing twenty years of total credited service. AMC 03.85.220(A). Unlike members of Plans I and II, Plan III members must complete at least fifteen years of total credited service to become eligible for "early service" retirement benefits. AMC 03.85.220(D).

**11.** AMC 03.85.100(G) provides:

An independent actuarial evaluation of Plans I and II shall be made no less frequently than every two years. The actuary shall determine the percentage of gross monthly compensation required to maintain Plans I and II as actuarially sound and shall report to the board the percentage attributable to members and the percentage attributable to the Municipality of Anchorage. The required percentage contributions shall reflect an actuarially determined 2.5:1 municipality/ member contribution ratio for members of Plan II.

cannot be read to allow a calculation of actuarial soundness including members of any other plan, including Plan III. A separate provision, AMC 03.85.210(A), required an annual "actuarial valuation of Plan III ... to determine the contribution rate required to maintain the actuarial integrity of Plan III."

Given these distinctions in contribution rates and benefits, and the explicit requirement for a separate actuarial evaluation for Plans I and II, it is not surprising that MOA and APFRS treated the plans as separate except for purposes of investing the assets: in the words of the consulting actuary, "The System has historically been funded as three separate plans."

The separate treatment of plan funding confirms the apparent scheme originally created by the enabling ordinance. Nothing about the APFRS before 1994 would have alerted newly enrolled plan members that their contributions might be used prospectively or retrospectively to fund one of the other plans. For example, had the investments for Plan I been extremely unsuccessful, Plan III members would have had no reason to expect when they enrolled that any surplus in Plan III might be used to remedy any deficiency in Plan I. Anchorage Municipal Code 03.85.210(A), which requires "independent actuarial valuation of Plan III ... in order to determine the contribution rate required to maintain the actuarial integrity of Plan III," strongly implies otherwise.[12]

MOA argues that because these are defined benefit plans, members have no right to share or reasonable expectation of sharing in any surplus created by overcontributions or investment success. The other side of that argument, however, is that before 1994, the enabling code provisions gave MOA no right to divert accumulations attributable to members of one plan for the benefit of members of a different plan. Likewise, members would have had no reason to think that the fruits of their own contributions might reduce the contributions of members of a different plan. Instead, a contrary expectation was reasonable: because the plans provided defined benefits, MOA was obliged to pay any deficiency. That obligation was inconsistent with requiring members of one plan to help remedy a funding deficiency in another plan. Similarly, provisions for separate valuations to calculate the contribution rates for each plan to maintain "the actuarial integrity of Plan III," AMC 03.85.210(A), and "Plans I and II as actuarially sound," AMC 03.85.100(G), render the defined benefit feature inconclusive.

Consequently, whether or not members of Plans I and II expected when they enrolled to share in any surplus by an increase in benefits, they reasonably could have expected that the product of their contributions would be used for their ultimate benefit. Certainly they could not have expected that any surplus would be used for the benefit of non-plan members.

To do what AO 94–95 would require would squarely conflict with AMC 03.85.100(G) with respect to Plans I and II. It would also implicitly conflict with the separation inherent in plans which have different contribution rates, different benefits, and different obligations. At the least, as the superior court observed, maintaining the separation among the funds "enhances the integrity of a plan, a condition clearly more favorable to its members than the dilution effected by AO 94–95." Superior Court Order at 15 n. 14.

MOA asserts that the surpluses contained in Plans I and II are excess to the needs of those plans. We note, however, that the actuaries' 1994 responses to an APFRS inquiry about the impact of combining the

---

12. *See also* AMC 03.85.210(B), which provides:
The member's maximum contribution rate shall be fixed by the board once every five years. The board may reduce or increase the contributions of both Anchorage and the member at any time so long as that action does not unreasonably jeopardize the actuarial integrity of the plan and so long as the member is never required to contribute more than the maximum contribution rate applicable at the time of such reduction or increase. At all times, the contribution ratio of Anchorage to member shall be maintained at a ratio of not less than 2.5:1. If additional monies are necessary to assure that Plan III is financially sound at all times and the member's contribution rate has already been set at the maximum, then Anchorage shall be solely responsible for contribution of such additional monies.

plans reveal that (depending upon assumptions regarding additional enrollments, suspension of Plan III contributions, and declines in investment returns) the funding for the combined system was reduced to either 102% or 99%. Consequently, combining the three plans clearly impaired the inherent integrity of Plans I and II. MOA argues that its obligation to guarantee the defined benefits makes any surplus irrelevant. MOA might as well argue that it could have altogether suspended its contributions, on the theory its probable future solvency would have permitted it to guarantee benefits even if the funds were not actuarially sound.

◼ We conclude that AO 94–95 unconstitutionally impairs the vested right of members of Plans I and II to have the actuarial soundness of those plans evaluated and maintained separately without being affected by the soundness of other plans. That failure impairs the ability of Plans I and II to withstand future contingencies, such as increases in plan obligations, declines in investment revenue and inability by MOA to fund any shortfall. It is therefore unconstitutional. Given that conclusion, we need not also consider whether the Board's 1993 Statement of Investment Policy gave rise to any rights which could be considered to have vested and which were impaired or diminished by AO 94–95.

### 3. *Cases from other jurisdictions*

MOA, citing cases from other jurisdictions, asserts that employees under a defined benefit pension plan have no constitutional right to the surpluses in their plans; it argues that the only vested right which cannot constitutionally be diminished or impaired is the receipt of the statutorily defined benefits.[13] *See Poggi v. City of New York,* 109 A.D.2d 265, 491 N.Y.S.2d 331 (1985), *aff'd,* 67 N.Y.2d 794, 501 N.Y.S.2d 324, 492 N.E.2d 397 (1986)

(upholding constitutionality of supplemental benefits statute allowing certain investment earnings of retirees' defined benefit plan to be allocated as supplemental benefits because the statute did not impair or diminish the level of benefits provided under the pension statutes); *Halstead v. City of Flint,* 127 Mich.App. 148, 338 N.W.2d 903, 906 (1983) (upholding a supplemental benefits statute funded by the pension plan's surplus and only for the benefit of certain retirees, holding that "because there is no evidence that [the ordinance] diminishes or impairs the full payment of plaintiffs' accrued financial benefits, the ordinance does not violate the constitutional proscription against impairment of contracts.").

MOA also relies on *State ex rel. Dadisman v. Caperton,* 186 W.Va. 627, 413 S.E.2d 684 (1991). The West Virginia Retirement System consisted of two retirement plans, one fully funded and the other underfunded, within a single system. *Id.,* 413 S.E.2d at 686, 690. The monies of both plans had been accounted for on a system-wide basis and collectively invested. *Id.* at 690. A subsequently enacted statute allowed the two plans to be actuarially valued as one system to determine the amount of employer contributions required; this allowed contributions to be suspended because the system as a whole was actuarially sound although funds from the overfunded plan were diverted to cover losses in the underfunded plan. *Id.* Members of the overfunded plan alleged that the surplus in their plan belonged to them, and could not be diverted to cover liabilities in the other plan. *Id.* The court rejected this argument, finding that so long as the system remained actuarially sound there was no violation. *Id.*

Whether or not these cases are distinguishable, as the class argues,[14] we need not

---

**13.** Under the federal Employee Retirement Income Security Act (ERISA), codified at 29 U.S.C. §§ 1001–1461 (1985), employees are entitled to receive any surpluses generated by their pension plans when a plan is terminated unless the plan document provides for a reversion of the excess assets to the employer. *See* 29 U.S.C. § 1344(d)(1) (Supp.1997).

The plans at issue are not governed by ERISA because ERISA exempts "governmental plans" from its coverage. *See* 29 U.S.C. § 1321(b)(2).

**14.** In *Poggi,* the pension statute expressly stated that the pension benefits would not fluctuate with the fund's investment earnings. *Poggi v. City of New York,* 109 A.D.2d 265, 491 N.Y.S.2d 331, 333 (1985), *aff'd,* 67 N.Y.2d 794, 501 N.Y.S.2d 324, 492 N.E.2d 397 (1986). *Dadis-*

consider whether the class members had a right to receive increased benefits or share in the accumulated surplus, because we have held that AO 94–95 impairs the vested right of members of Plans I and II to have actuarial soundness of Plans I and II evaluated independently of any other plan.

We are more persuaded by *Valdes v. Cory*, 139 Cal.App.3d 773, 189 Cal.Rptr. 212 (1983), cited by the class in support of its argument that members of Plans I and II had a vested interest. During a budget crisis the California legislature passed emergency legislation that allowed the state to suspend contributions to the public employees retirement system. *Id.*, 189 Cal.Rptr. at 216–17. Although the state's action had not reduced employee benefits under the system, the court determined that the state could not suspend or reduce its statutorily defined contributions absent actuarial input to ensure that the system would remain actuarially sound. *Id.* at 223. The court stated that although an employee may not suffer out of pocket expenses, "the interest of the employee at issue here is in the security and integrity of the funds available to pay future benefits." *Id.* at 222.

### B. *The Award of Attorney's Fees*

Pursuant to Civil Rule 82(b)(1), the class sought an attorney's fees award against MOA equal to 2% of the "judgment" or "common fund." [15] The class asserted that the judgment or common fund equaled the amount, roughly $40 million, restored to Plans I and II. The class also asked the court to award class counsel compensation equal to the Rule 82 award plus an additional 6% of the common fund, for a total of 8% of the amount restored to Plans I and II.

The superior court imposed a Rule 82(b)(2) award against MOA for full hourly attorney's fees [16] of $76,618.34 (the product of counsel's hours and an hourly rate of $225).[17] The superior court declined to follow a common fund approach, citing "the lack of money judgment and the difficulty in determining the monetary value of the judgment." It also stated that "it would be inappropriate to significantly diminish the assets" of the plans to fund a fee award.

The class argues that the award undercompensated class counsel and that it was error not to apply the Rule 82(b)(1) schedule to the judgment or common fund and not to allow the class to bear the litigation cost by awarding counsel 6% of the surplus restored to the plans. The class's arguments depend in part on its assertion that restoration of the surplus funds created a common fund or money judgment.[18] MOA argues that it was an

---

*man* was not decided under a constitutional provision specifically addressed to retirement benefits like article XII, section 7 of the Alaska Constitution; *Dadisman* was decided under the contracts clause of the West Virginia Constitution. *State ex rel. Dadisman v. Caperton*, 186 W.Va. 627, 413 S.E.2d 684, 686 (1991).

15. A prevailing party is normally entitled to an attorney's fees award. Alaska R.Civ.P. 82(a). When a money judgment is recovered, the award is calculated per a sliding schedule in Civil Rule 82(b)(1), including 2% of that portion of a judgment over $500,000 in a contested case resolved without trial.

16. MOA argues that the superior court awarded full "actual" attorney's fees. The award did not precisely equal the fees the class agreed to pay counsel, but were instead the full reasonable fees calculated by the court on an hourly basis. We will refer interchangeably to actual and hourly fees for the remainder of this opinion.

17. Per Civil Rule 82(b)(2), when the prevailing party recovers no money judgment in a case resolved without trial, the award is 20% of the

prevailing party's actual attorney's fees. After considering factors listed in Civil Rule 82(b)(3), a trial court may vary from the amounts awardable under Rule 82(b)(1) and (2).

As justification for not limiting the award to 20% of actual fees per Rule 82(b)(2), the superior court considered the following Rule 82(b)(3) factors: the use of the class action procedure provided a substantial benefit to the plaintiffs who might not otherwise have had access to the courts; the plaintiffs litigated this matter efficiently and successfully which minimized the fees incurred; a partial award would not achieve the policy goal of providing a legitimate incentive for attorneys to represent a class; there was significant litigation risk and plaintiffs had difficulty retaining counsel; and the issues were unusually complex and the significance of the relief obtained was great. *See* Alaska R.Civ.P. 82(b)(3)(A)–(K).

18. Although the APFRS Board asserts that the class has "effectively disclaimed" fees based on a "common benefit" theory, we read the class's arguments regarding the common fund doctrine

abuse of discretion to award the class full actual fees absent a finding that MOA engaged in bad faith or vexatious conduct. The APFRS Board argues that the class created no common fund and that no award should be made from the APFRS assets.

■ Two main questions are presented.[19] The first relates to fee-sharing: What fees do class members owe class counsel? The second relates to fee-shifting: What fees should the class, as the prevailing party, recover from MOA under Rule 82? Given our recent approval of a two-step process for calculating attorney's fees in class actions, *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 263–64 (Alaska 1996), the answer to the first question bears on the answer to the second.

### 1. *Fees due class counsel*

The class retained counsel under an agreement obliging it to pay $5,000 for the initial consultation and analysis, up to $25,000 in hourly fees at a rate of $75 per hour, and not more than 10% of any common fund recovered. If the total of the Rule 82 award and common fund fees was less than 10% of the common fund, counsel would receive that total. If the total was more than 10% of the common fund, the class would receive the excess. The agreement did not squarely specify counsel's fees if there was a Rule 82 award but no common fund; it appears the parties assumed counsel would receive any Rule 82 fees awarded to the class, and up to $30,000 from the class members whether or not the class prevailed. When they asked the superior court to approve fees for counsel, the class and its attorneys reasoned that a common fund had been achieved, and that the agreement consequently governed counsel's fees.

■ We have recently discussed the common fund doctrine. *Gentile*, 922 P.2d at 265; *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751 (Alaska 1996). The doctrine is "implicated any time one litigant's success releases well-

defined benefits for a limited and identifiable group of others." *Edwards*, 920 P.2d at 755.

■ Because Plans I and II are defined benefit plans, and because the enabling ordinance did not require that any surplus be paid out to members as increased benefits, members had no vested right to receive increased distributions funded by the surplus. As noted previously, the constitutional flaw in AO 94–95 is not that it takes some particular amount from the surplus for Plans I and II, but that it fails to respect the vested right of members of Plans I and II to have the actuarial soundness of those plans evaluated and maintained separately, without being affected by the soundness of any other plan. The quantitative value of this impairment cannot be directly measured by the amount of the restored surplus, because the value of the impairment is contingent. The record before us does not address the likelihood of those contingencies and does not permit quantitative valuation of the litigation benefit achieved.

■ Further, the common fund doctrine is based on the principle of equitably spreading counsel's fees among the benefitted class members. *Gentile*, 922 P.2d at 267. It is impossible to calculate from the appellate record how the restored surplus financially benefits individual members. The contingent benefit may be more valuable to some members than others. (The value might turn, for example, on the projected duration and value of a member's benefits.) Absent any present right to share directly in the surplus, valuing the benefit achieved for each class member is difficult, if not impossible. Calculating the amount of litigation expense each member should bear is equally difficult.

To be distinguished is *Gentile*, where the class successfully challenged a reduction of post-retirement medical benefits and the superior court restored the benefits to their previous level. *Gentile*, 922 P.2d at 252. Success in the instant case did not alter the benefits which MOA must pay per the plans.

---

to encompass a claim based on the value of benefits received by the class.

**19.** We review a trial court's award of attorney's fees for an abuse of discretion. *Hughes v. Foster Wheeler Co.*, 932 P.2d 784, 793 (Alaska 1997).

We conclude that counsel's success did not release "well-defined benefits" constituting a common fund. The superior court did not err in implicitly declining to award class counsel any part of the surplus restored to the plans.

Citing *Grein v. Cavano*, 61 Wash.2d 498, 379 P.2d 209 (1963), the class appears to argue that the common benefit doctrine would justify a fees award funded by restored plan assets. It thus implicitly argues that references in the fee agreement to a "common fund" also encompass a common benefit. The superior court's findings dispose of this argument. In declining to follow a common fund approach, the superior court noted the lack of a money judgment and the difficulty in determining the value of the judgment. It also found that it would be inappropriate to "significantly diminish" the plans' assets to fund a fee award. The superior court's observation about the difficulty of determining the value of the judgment remains relevant and valid; its conclusion that it would be inappropriate to diminish plan assets to fund an award is not erroneous. That conclusion controls, and dooms, a common benefit award funded by plan assets.

### 2. *Rule 82 fees*

 This does not end our inquiry. In *Gentile*, we adopted a two-step analysis for calculating the Rule 82 attorney's fees to be awarded the prevailing party in class actions. The trial court must "(1) determine the compensable value of the services the attorneys rendered to the class, and (2) apply Rule 82 to the amount calculated in Step 1 to decide how much [the non-prevailing party] should pay." *Gentile*, 922 P.2d at 263. The compensable value or actual fees are what the client has agreed to pay, and are not necessarily limited to the product of an attorney's hourly rate times the number of hours

worked. *Id.* at 264. We also noted that "where the attorney charges no fee or a lower than usual fee, however, the proper approach is to value the attorney's services and to make a Rule 82 award which is some fraction of this value. *Arctic Slope Native Ass'n v. Paul*, 609 P.2d 32, 38 (Alaska 1980)." *Gentile*, 922 P.2d at 263 n. 20. In determining the compensable value of class counsel's services, the court may consider such factors as "the need to promote the efficient use of court resources" through the use of class action litigation, and "the potential difficulty of attracting capable counsel." *Id.* at 264. We also held in *Gentile* that the absence of a traditional fund does not preclude application of the common fund rationale in an appropriate case, when evaluating the attorney's services during Step 1. *Id.* at 266. We noted that counsel's fees might be calculated by either a lodestar or percentage of fund approach. *Id.* We recognized, however, that any difficulty in calculating the value of the common benefit may make the percentage approach "inappropriate." *Id.*

 In this case, it is appropriate to use the two-step model to calculate counsel's fees and the Rule 82 award. The fees the class agreed to pay did not necessarily measure the fair value of the services provided. Although the superior court made its award before we decided *Gentile*, it calculated the value of counsel's services as $76,618.34. Under the two-step *Gentile* methodology, the superior court might then have calculated counsel's fees using a lodestar approach. That method considers various factors [20] and considers whether to award some multiple of the incurred fees. That would have been an appropriate way to calculate the value of counsel's services based on the market value of the hours spent at a reasonable hourly rate.

---

**20.** Courts using the lodestar approach have either used a simple lodestar formula, *see Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166–68 (3d Cir.1973), *aff'd in part and vacated in part*, 540 F.2d 102, 112–18 (3d Cir.1976), or hybrid or "blended" lodestar approaches examining several factors when determining the multiplier to be used, *see In re Washington Public Power Supply*

*System Securities Litigation*, 19 F.3d 1291, 1294–95 & n. 2 (9th Cir.1994).

In *Edwards* we noted the existence of different lodestar tests. 920 P.2d at 757. It is premature for us to decide which standard should apply here. We prefer to review this question in the context of an appeal in which the trial court has actually conducted an analysis of the lodestar factors as part of the dispute before it.

It appears that the superior court has already calculated the market value of counsel's services. Because a court might in its discretion choose to apply a multiplier in such a case, it is necessary to remand for consideration of the lodestar factors. On remand the trial court can decide whether to apply a lodestar multiplier, and, if so, the appropriate factor.

After the trial court calculates the value of counsel's services in Step 1, it will be able to calculate the amount of fees to be assessed against the losing party under Rule 82. Rule 82(b)(2) initially applies here because the class recovered no money judgment. The presumed fee award is 20% of the fees "incurred" (as calculated in Step 1), subject to deviation upon consideration of the factors listed in Rule 82(b)(3).

The superior court chose to deviate from the 20% standard to award full hourly fees. To some extent, the factors that led the court to award full hourly fees may duplicate considerations that will bear on any lodestar analysis. Because the gross value of counsel's fees if the superior court applies a lodestar factor on remand may differ from the value previously calculated by the superior court, and because the superior court may wish to reconsider the Rule 82(b)(3) factors given our recent adoption of the two-step methodology in *Gentile*, it is also necessary to remand for reconsideration of the Rule 82 award.

### 3. Full actual fees

MOA argues that full actual fees should not have been granted because there was no finding that MOA litigated in bad faith. The purpose of shifting attorney's fees under Civil Rule 82 to the non-prevailing party is to "compensate a prevailing party partially, not fully, for attorney's fees incurred in litigation." *Demoski v. New*, 737 P.2d 780, 788 (Alaska 1987).

The class, however, argues that full actual fees were reasonable since class counsel would otherwise be seriously undercompensated. The class asserts that Civil Rule 82 is designed to compensate a prevailing party, but is not intended to compensate a litigant's attorney, which in non-class action cases is a matter resolved between the attorney and client in their fee agreement. The class's counsel states that since the court must approve the amount of fees counsel receives, and the awarded fees are counsel's only source of compensation, MOA should be required to pay the class's full fees or counsel will be undercompensated.

The issue of undercompensation in this case is properly addressed in the Step 1 analysis. Once the fair value of counsel's services to the class has been determined, the traditional Rule 82 analysis may be applied in Step 2. Because we remand for reconsideration of fee issues in light of the two-step *Gentile* methodology, and because the superior court on remand will be free to reconsider the Rule 82(b)(3) factors, we need not now decide whether it was error to award the class full hourly fees against MOA, and whether class counsel was undercompensated.

### 4. Fees against APFRS

Because we conclude that the superior court did not err in deciding that it was inappropriate to fund an award from plan assets, we agree with APFRS's argument that no fees should be awarded against the APFRS Board members or payable from APFRS assets.

### IV. CONCLUSION

We AFFIRM the superior court judgment that held that AO 94-95 violates article XII, section 7 of the Alaska Constitution. We AFFIRM the denial of a fee award against APFRS. We REMAND the remaining attorney's fees issues for further proceedings consistent with this opinion.

MATTHEWS and FABE, JJ., not participating.