Jim DUNCAN, Commissioner, Alaska Department of Administration, Guy Bell, Director, Division of Retirement and Benefits, and State of Alaska, Petitioners,

v.

RETIRED PUBLIC EMPLOYEES OF ALASKA, INC., Alaska AFSCME Retired Ch. 52, William T. Bryant, John Harris, individually and as class representatives, and National Education Association, National Education Association Retired, Jeanne Bradner, Joyce Hammonds, Edward Shellinger, and John and Jane Does 1–3, for themselves and other similarly situated, Respondents.

No. S–10377.

Supreme Court of Alaska.

June 13, 2003.

---

Kathleen Strasbaugh, Assistant Attorney General, Bruce M. Botelho, Attorney General, Juneau, for Petitioners.

Don Clocksin, Don Clocksin Law Office, Olympia, Washington, for Respondent NEA–AK.

Bradley D. Owens, Jermain, Dunnagan & Owens, PC, Anchorage, for Respondent RPEA.

Jay W. Trumble, Anchorage, for Respondent ASEA Local 52.

Before: MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I.  INTRODUCTION

Article XII, section 7 of the Alaska Constitution protects retirement benefits of public employees from diminishment or impairment. But benefits may be changed if any detriments are offset by advantages. The main question here is whether as to changes in health insurance plans this balance must be struck taking the perspective of each individual or the group. We conclude that the group perspective must generally be used because individual evaluations are subjective and uncertain.

## II.  FACTS AND PROCEEDINGS

In 2000 three retiree organizations and individual members (collectively "the retirees") brought separate lawsuits against Bob Poe,[1] Commissioner of the Alaska Department of Administration; Guy Bell, Director of the Alaska Division of Retirement and Benefits; and the State of Alaska (collectively "the state"), alleging, in part, that changes made to the state's group health insurance plan for retired public employees in 1999 and 2000 violated article XII, section 7 of the Alaska Constitution by diminishing accrued benefits. The cases were consolidated and then certified as a class action. The classes consisted of more than 20,000 retired persons eligible for retirement benefits under Alas-

---

1. Commissioner Jim Duncan was substituted for Commissioner Bob Poe on Petition for Review to the Supreme Court.

ka's Public Employees' Retirement System[2] (PERS) and Teachers' Retirement System[3] (TRS). The background of these suits is set out in the following paragraphs.

In 1975 the state began paying premiums for major medical insurance for PERS and TRS retirees.[4] The coverage was subject to deductibles, co-payments, and maximum limits. When it was first instituted, and periodically thereafter, state publications advised state employees that the benefits would be provided and paid by the state during their retirement.[5] Changes in the insurance were made periodically: services were added, precertification was required as a cost-saving measure, and co-payments were changed. In 1986 for PERS and 1990 for TRS substantial changes were made by lowering benefits and increasing the retirement age for employees starting work after these dates. The changes thus resulted in a second tier of retirees.

In 1998 a number of retirees requested that the state update the retiree health plan. The respondent, Retired Public Employees of Alaska, suggested a number of coverage changes. The state was not opposed to changing the plan but sought to achieve "cost neutrality" by balancing cost-increasing changes with cost-saving changes.[6] After a substantial process of consultation, the state in 1999 and 2000 made a number of changes to the plan. Some of the changes provided greater benefits; others were disadvantageous to retirees.[7]

The retirees were dissatisfied with these changes and sued the state, seeking a declaration that the changes amounted to an impermissible diminishment of accrued benefits under article XII, section 7 of the Alaska Constitution. They also sought an injunction against any modification that required retired public employees "to pay any costs for medical benefits without providing sufficient comparable new advantages that constitute an effective offset for any such costs." Finally, they sought damages for retired public employees "for the costs they have incurred or paid after the modifications." After substantial discovery both parties moved for summary judgment. Superior Court Judge Mark Rindner granted the retirees' motion

2.  AS 39.35.010–.690.

3.  AS 14.25.010–.220.

4.  "Each person who is entitled to receive a monthly benefit from the retirement system shall be provided with major medical insurance coverage." Ch. 200, §§ 1–2, SLA 1975.

5.  A 1975 booklet is typical. It stated: "The entire cost of this Medical Program for Retired Employees and their eligible family members will be paid by the Public Employees Retirement or Teachers' Retirement Systems." In 1980 a handbook given to PERS members stated:

> Comprehensive major medical insurance coverage is provided for you, your spouse, and your eligible dependent children whenever you are receiving a retirement benefit, a disability benefit, or a survivor or death benefit from the system. This coverage is automatic and continues as long as you or your survivors are eligible to receive benefits from the system. There is no cost to you for this insurance.

6.  According to Allison Elgee, Deputy Commissioner of the Department of Administration, cost neutrality was important not only to avoid increasing the cost of the medical plan to the retirement systems but also to the second tier employees who upon retirement before the age of 60 had to pay a full premium for the plan and upon reaching the age of 60 had to pay a half premium until reaching the age of 65.

7.  In general, the changes that improved coverage included an increase in the lifetime maximum payment from $1 million to $2 million, changing travel benefits from one-way to round trip, increasing from $15 per visit to 80% payment for precertified mental health and chemical dependency treatment, providing free mail-order service for generic or brand name drugs (previous coverage was $5 for each brand name drug while generic drugs were free), and reimbursing retirees eligible for Medicare for 100% of covered expenses not paid by Medicare rather than the previous 80%. The Medicare change was by far the most important and expensive change. The reductions in benefits included increasing the deductible from $100 to $150 per year, eliminating a provision that waived the annual deductible once $50,000 in claims were paid, eliminating the lifetime co-insurance of 100% once $50,000 in claims were paid, changing co-insurance from 80% of $1,950, 90% of the next $3,000, and 100% of the remainder to co-insurance of 80% of the first $4,000 and 100% of the remainder. This resulted in a change of maximum out-of-pocket payments from $690 per year to $800 per year. In addition, if the retiree does not use the mail-order service for drugs, the cost for generic drugs increased from $0 to $4 and the cost for brand name drugs increased from $5 to $8.

for summary judgment and denied the state's cross-motion.[8] The court deferred ruling on remedies pending further briefing. Meanwhile, the state petitioned this court for review of the superior court's decision on summary judgment, and we granted the state's petition.

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo.[9] Summary judgment is proper if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.[10] "The proper interpretation of a constitutional provision is a question of law to which this court applies its independent judgment."[11]

## IV. DISCUSSION

The state makes several arguments, but only three are within the scope of the summary judgment order of the superior court. This opinion is restricted to these arguments. They are:

(1) Article XII, section 7 of the Alaska Constitution does not encompass health insurance benefits;

(2) Alternatively, if article XII, section 7 encompasses health insurance benefits, it only requires that premiums paid on behalf of the retirees not be diminished; and

(3) Alternatively, if article XII, section 7 encompasses health insurance benefits and guards against more than a reduction in premiums, changes in benefits are permissible so long as disadvantages resulting from such changes are balanced or outweighed by advantages and that this calculation must be made from a group rather than an individual perspective.

For reasons that are similar to those expressed by the superior court, we reject the first two arguments made by the state. But

we agree with the state's third argument for the reasons expressed below in part D.

### A. Article XII, Section 7 Overview

Article XII, section 7 of the Alaska Constitution provides:

Retirement Systems. Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.

Under this section, retirement benefits are "regarded as an element of the bargained-for consideration given in exchange for an employee's assumption and performance of the duties of his employment."[12] "[A]n employee's rights to benefits under [retirement] systems ... vest on employment and enrollment in the system" rather than "at the time when an employee becomes eligible to receive those benefits."[13] This means that system benefits offered to retirees when an employee is first employed and as improved during the employee's tenure may not be "diminished or impaired." But this prohibition does not mean that vested benefits cannot be altered. Reasonable modifications are permissible. But to be sustained as reasonable, changes that result in disadvantages to employees should be accompanied by comparable new advantages.[14]

These principles are not in dispute. What is disputed is whether the term "accrued benefits" in article XII, section 7 includes health insurance benefits and if so how to apply the "diminished or impaired" prohibition to challenged changes in coverage.

### B. Article XII, Section 7 Includes Health Insurance Benefits.

When construing the constitution, our objective is "to give effect to the intent

---

8. We set out in an appendix the full text of the discussion portion of Judge Rindner's thorough opinion.

9. *Alakayak v. British Columbia Packers, Ltd.,* 48 P.3d 432, 447 (Alaska 2002).

10. *Id.*

11. *Hickel v. Cowper,* 874 P.2d 922, 926 (Alaska 1994).

12. *Hammond v. Hoffbeck,* 627 P.2d 1052, 1056 (Alaska 1981).

13. *Id.* at 1055.

14. *Id.* at 1057.

and purpose of the framers of the constitutional provision and of the people who adopted it. Unless the context suggests otherwise, words are to be given their natural, obvious and ordinary meaning."[15] In the present case there is little question that the phrase "accrued benefits" as used in article XII, section 7 of the Alaska Constitution, if given its natural and ordinary meaning, would encompass health insurance benefits offered to public employee retirees.

The state argues that since health insurance benefits were not provided by territorial retirement systems when the Alaska Constitution was drafted and ratified, they were not meant to be included within the term "accrued benefits." The state also argues that practical considerations counsel against the inclusion of health insurance benefits as constitutionally protected accrued benefits. The state observes that Congress when enacting the Employment Retirement Income Security Act (ERISA) decided not to impose vesting requirements on medical insurance plans because so doing would "seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income."[16] According to the Third Circuit:

> Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs.[17]

We find the state's historical argument unpersuasive. The term "accrued benefits" is used in article XII, section 7 without limitation, suggesting that whatever benefits might be provided by state retirement systems were meant to be covered. Nothing in the text of article XII, section 7, nor in the history of the Constitutional Convention, suggests the founders intended to limit "accrued benefits" to the particular types of benefit being provided by territorial retirement systems at the time of ratification of the constitution.

Our case law suggests that "accrued benefits" should be defined broadly. In *Hammond v. Hoffbeck* we held that death benefits payable to the beneficiaries of retirees were encompassed.[18] We stated:

> The fact that part of an employee's benefit package is, effectively, a life insurance policy, the proceeds of which will never be received by the employee, does not make that whole package any less an element of the consideration that the state contracts to tender in exchange for services rendered by the employee.[19]

To paraphrase the above language, medical insurance is also part of an employee's benefit package and the whole package is an element of the consideration that the state contracts to tender in exchange for services rendered by the employee. Similarly, in *Sheffield v. Alaska Public Employees Association, Inc.*, we referred to protected rights and benefits as a "whole complex of provisions."[20] In *Municipality of Anchorage v. Gentile* one question was whether retirement medical benefits negotiated between the municipality and a union were intended to be vested.[21] Evidence indicated that the parties intended the negotiated benefits to be the

**15.** *Id.* at 1057 n. 7 (quoting *County of Apache v. Southwest Lumber Mills, Inc.*, 92 Ariz. 323, 376 P.2d 854, 856 (1962) (en banc)); *see also Hickel*, 874 P.2d at 926 (quoting *Arco Alaska, Inc. v. State*, 824 P.2d 708, 710 (Alaska 1992)).

**16.** *In re Unisys Corp. Retiree Medical Benefit "ERISA" Lit.*, 58 F.3d 896, 901 (3d Cir.1995) (quoting *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir.1990)).

**17.** *Id.* at 901 (quoting *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir.1988)).

**18.** 627 P.2d 1052, 1059 (Alaska 1981).

**19.** *Id.*

**20.** 732 P.2d 1083, 1087 (Alaska 1987) (quoting *Opinion of the Justices*, 364 Mass. 847, 303 N.E.2d 320, 327 (1973)).

**21.** 922 P.2d 248, 258 (Alaska 1996).

same level and type of medical benefits received under PERS. We reasoned that since "PERS benefits are vested, it is fairly inferable that the parties also intended the [negotiated] benefits to vest." [22]

■ We conclude that the term "accrued benefits" is not limited to just the benefits that were provided to public employees at the time of ratification of the constitution. Instead, the term includes all retirement benefits that make up the retirement benefit package that becomes part of the contract of employment when the public employee is hired, including health insurance benefits.[23]

With respect to the state's argument that practical considerations should lead to a narrow construction excluding health benefits from constitutional protection, we acknowledge that medical costs are rapidly rising, making health insurance increasingly difficult to provide. But we do not believe that this fact is of sufficient weight to change the meaning of the plain language of article XII, section 7.

## C. Article XII, Section 7 Does Not Merely Protect Against the Diminishment of Premium Payments Made on Behalf of Retirees.

The state argues that "[r]etirees should be limited to whatever the dollar contribution in force at the time of his/her retirement can purchase." The state's argument, in other words, is that the accrued benefit that is constitutionally protected is the highest monthly premium paid by the public employer during the employee's employment, rather than the coverage provided. The state cites no authority in support of this argument, but offers practical reasons:

> The principal policy consideration is the ever-increasing cost of health care, which over the years has risen at a rate far greater than the rate of inflation.
>
> . . . .
>
> . . . [I]t is obvious that a requirement that the retirement systems maintain the current level of services—or a requirement that cost-saving changes to the current plan be balanced by enhancements of equal cost—has the potential to put severe strains on the systems, jeopardizing their ability to pay any benefits.

The retirees argue that the plain language of article XII, section 7 is contrary to the state's position. They also contend that the representations made in employee handbooks over the years conflict with the state's current position.

■ We believe that the retirees have the better of this argument. The natural and

---

**22.** *Id.*

**23.** Our conclusion in this respect is in accordance with similar conclusions reached by numerous state courts holding that medical benefits are part of vested retirement benefits. *See, e.g., Thorning v. Hollister Sch. Dist.,* 11 Cal.App.4th 1598, 15 Cal.Rptr.2d 91, 95 (1992) (holding that health and life insurance benefits were not dissimilar from pension benefits and could not be unilaterally terminated because they were important as inducement for continued service and as factor in decision to retire); *Weiner v. County of Essex,* 262 N.J.Super. 270, 620 A.2d 1071, 1079–80 (1992) (finding that post-retirement medical benefits were property rights of employees employed at the time, and thus the county could not unilaterally terminate them); *Emerling v. Village of Hamburg,* 255 A.D.2d 960, 680 N.Y.S.2d 37, 37–38 (N.Y.App.Div.1998) (holding that absent express reservation of rights, city could not eliminate retiree medical benefits impliedly promised in return for ten years of employment); *McMinn v. City of Oklahoma City,* 952 P.2d 517, 521–22 (Okla.1997) (holding that retirement benefits included package of pension, medical, and other benefits rather than pension benefits alone); *State ex rel. City of Wheeling Retirees Ass'n, Inc. v. City of Wheeling,* 185 W.Va. 380, 407 S.E.2d 384, 387 (1991) (construing statute to require same medical insurance benefit level for retiree as for employee); *Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816, 829–31 (1988) (finding that state must appropriate funds for retiree health insurance benefits rather than redirect funds already present in retiree trustee accounts).

Some states have reached different conclusions. *See, e.g., Colorado Springs Fire Fighters Ass'n, Local 5 v. City of Colorado Springs,* 784 P.2d 766, 770–73 (Colo.1989) (finding that city ordinance providing health benefits for retired city employees did not create vested, contractual pension right to receive benefits); *Musselman v. Governor,* 448 Mich. 503, 533 N.W.2d 237 (1995), *modified,* 450 Mich. 574, 545 N.W.2d 346, 347–48 (1996) (concluding upon rehearing that the "financial benefits" protected by state constitution did not necessarily include health benefits); *Davis v. Wilson County,* 70 S.W.3d 724, 727–28 (Tenn.2002) (holding that health care benefits did not vest and could be terminated absent clear intent for them to vest).

ordinary meaning of "benefits" in a health insurance context refers to the coverage provided rather than the cost of the insurance. Further, the various employee publications promise coverage, not merely payment of a particular premium.[24]

The state's argument that the pension system may at some point be threatened by increasing costs of health care is a serious one. Again, however, we do not believe that this argument is sufficient to change the meaning of the constitutional language in question.[25]

### D. Whether Health Insurance Benefits Have on Balance Been Diminished or Impaired Must Be Measured from a Group Rather than an Individual Standpoint.

As already noted, in *Hammond v. Hoffbeck* we held that the prohibition on diminishment or impairment of retirement benefits does not mean that retirement benefits are unchangeable. Instead, benefits can be modified so long as the modifications are reasonable, and one condition of reasonableness is that disadvantageous changes must be offset by comparable new beneficial changes.[26]

In *Hoffbeck* we held that determinations of whether detrimental and beneficial changes are sufficiently in balance should be made on a member-by-member basis, rather than collectively.[27] The state challenges the application of an individualized approach in the context of health insurance, arguing that such an approach is unworkable:

> With a health insurance plan, it makes no sense to balance advantages and disadvantages to an individual at a particular moment in time, because one never knows what one's health will be from one moment to the next.... The retirees' approach as set out in affidavits is that if a member isn't presently using an offered benefit, that benefit cannot be considered an enhancement of the plan, and can't offset a disadvantage. This is anathema to the concept of major medical coverage. The purpose of a group plan is to spread risk among individuals both healthy and sick, and over the course of time, for an individual and ... family both when they are sick and when they are well.[28]

The retirees do not directly respond to the state's argument that taking an individualized approach to balancing benefits and det-

---

**24.** The 1975 booklet promises: "The entire cost *of this Medical Program ...* will be paid by [the systems]." And the 1980 handbook provides that *"[c]omprehensive major medical insurance coverage is provided ....* There is no cost to you for this insurance." (Emphasis added.) *See supra* note 5.

**25.** In *Hammond v. Hoffbeck* we stated:

> We are not called upon to consider the problem, which has frequently arisen in other jurisdictions, presented by a pension fund that is insufficient to satisfy all employee claims brought under its provisions. We intimate no view as to the appropriate legal analysis of any legislative alteration in employee benefits systems made in response to such circumstances. 627 P.2d at 1057 n. 11. That observation applies to this case as well.

**26.** *Id.* at 1057. We noted our general agreement with the approach taken by the California Supreme Court that recognizes that modifications may be made "for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system." *Id.* (quoting *Allen v. City of Long Beach*, 45 Cal.2d 128, 287 P.2d 765, 767 (1955)). We also quoted *Allen* as follows: "To be sustained as reasonable,

alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." *Hoffbeck*, 627 P.2d at 1057. In addition, we quoted another California case to the effect that "the offsetting improvement must also 'relate generally to the benefit that has been diminished.'" *Id.* (quoting *Betts v. Bd. of Admin. of the Pub. Employees' Ret. Sys.*, 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614, 617–18 (1978)).

**27.** *Id.*

**28.** Guy Bell, the Director of the Division of Retirement and Benefits, and as such the administrator of PERS and TRS, filed an affidavit in support of this aspect of the state's position. Mr. Bell affied:

> To my knowledge, no reasonable analysis of medical costs can be done on an individual by individual basis in the manner in which changes in individual retiree pension benefits can be calculated. The only realistic approach is to determine the total cost and benefit of the changes, as was done by the division and its professional consultants.

riments is unworkable. But the retirees do offer examples of a number of individuals who claim to have been harmed by the changes to the plan.

We refer to one as an example. R.D., a retired teacher, who is in his early fifties, has had his maximum co-pay amount increased from $690 to $800 per year, an increase of $110. Whereas he paid $4 each for brand name prescriptions under the old plan, he now must pay $8 and refuses the mail-order prescription service because he prefers a face-to-face relationship with his pharmacist. He is skeptical of the value of the improvements personally to him since he has never needed reimbursement for travel, feels that he is unlikely ever to reach a lifetime maximum of over $1 million, and will not qualify for Medicare (at age sixty-five) for a long time, and thus he feels that the most significant benefit of the new system, 100% of covered expenses not paid by Medicare, will be of questionable benefit to him.

R.D.'s affidavit well illustrates the state's point. For reasons of personal choice, R.D. chooses not to avail himself of the mail-order service savings; because he does not now have a condition that requires him to travel to obtain medical treatment, he believes that the new travel benefit will be of no benefit to him; because his treatment costs are not now approaching a maximum of $1 million, he believes that the increased cap of $2 million will not be of help to him; and because he is in his early fifties he has difficulty appreciating the value of increased Medicare coordination benefit. R.D.'s judgment that the benefits of this new system are of little value to him are subjective and rooted in the present. The benefits will have value to him, for example, if he chooses to use the mail-order drug service; if the conditions of his health change so that he must travel to receive treatment or receives treatment costing more than $1 million; or if he reaches the age of sixty-five. R.D.'s opinion that the detriments of the new plan exceed its benefits to him are incapable of objective verification [29] and review of his affidavit seems to illustrate the truth of the state's point that using an individualized approach in evaluating changes to health insurance plans is unworkable.

In *Hoffbeck* we applied the individualized approach to PERS changes that reduced occupational disability benefits and occupational death benefits. As to the reduction in death benefits, there was no offsetting advantage.[30] As to the reduction in disability benefits, the reduction was substantial, from two-thirds to two-fifths of monthly salary.[31] The claimed offsetting advantages were that workers' compensation awards recovered by disabled employees were previously setoff against disability benefits whereas under the new system there was no setoff.[32] We noted, however, that more than half of the employees disabled prior to the change received no workers' compensation benefits.[33] Two of the affiants had suffered disabling injuries. We stated that in these cases "serious hardship has resulted from application of the new system and ... no corresponding advantages have reduced that hardship."[34]

*Hoffbeck* relied principally upon *Betts v. Board of Administration of the Public Employees' Retirement System.*[35] *Betts* involved a change in the formula for calculating

---

**29.** Review of the other affidavits submitted by the retirees similarly show the speculative and subjective nature of the affiants' dismissive regard for the positive changes. For example, C.E. affies that the coordination of benefits with Medicare does not benefit her because the complexity of the system causes some medical providers to simply bill retirees rather than determining which insurance provider should pay. She also prefers her local pharmacy over the mail-order program for prescription drugs and thus does not derive any benefit from this change. C.E. further doubts she will ever exceed $1 million in benefits in her lifetime, rendering that benefit worthless to her. Finally, C.E. complains that the change from one-way to round-trip travel reimbursement provides no enhancement to her

benefits because she lives in a city where professional medical treatment is available.

**30.** 627 P.2d at 1059.

**31.** *Id.* at 1058.

**32.** *Id.*

**33.** *Id.*

**34.** *Id.*

**35.** 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614 (1978).

pension payments. The plaintiff in that case was a retired state employee who was disadvantaged by the change.[36] It was possible to determine with certainty that he received no offsetting comparable advantage. The difference was substantial since the controversy was whether his pension should be calculated on the basis of his highest salary while in office, $21,499, or on the basis of the current salary for the office in question, which was $35,000.[37]

■ *Hoffbeck* and *Betts* are distinguishable from the current case. Changes to fixed streams of income such as occupational disability and pension payments can be much more readily evaluated on an individual basis to determine whether they result in a net benefit than can changes to health insurance. Pension and occupational disability payments are, for the most part, predictable and fixed, while health insurance benefits change according to the unpredictable, changing medical needs of each individual. This difference suggests that the *Hoffbeck* individual assessment approach may be generally inappropriate with respect to health insurance.

A Michigan circuit court opinion has recognized the special problems that would result if health insurance benefits could not be changed:

> Plaintiffs seek a legal bulwark against any diminution of any portion of their current health benefits.... [T]his implies a set of health benefits frozen in time....
>
> ....
>
> It is self-evident that such an outcome would produce a huge chilling effect on the State's willingness to grant any health benefits to *future retirees,* because the costs of any such benefits are likely to increase over time, yet the State would have no authority to impose new cost containment measures, as it has sought to do here. And even the *existing retirees* would have earned a Pyrrhic victory, as their "frozen"

health benefits become more obsolescent with each passing year.[38]

In view of the ever changing nature of medical care, the Michigan court observed that "[t]he idea of a specific bundle of medical benefits, unchanging over time, ... is probably illusory." [39] Yet the court held that the state was not free to radically change the nature of health benefits that had vested in the employee group in question. The court concluded:

> [T]he rights which have vested in Plaintiffs are not rights to receive exactly the same package of health benefits which were offered [at vesting] but rather a right to a reasonable health benefit package, one which is in keeping with the mainstream of such packages, as they are negotiated and implemented for similarly situated active employees over time. This—not a "frozen" package of benefits and cost containment measures—is the meaning of "hospital, medical-surgical, and sick care benefits" mandated by the Legislature. This is the "central undertaking" to which Plaintiffs could reasonably believe they have entitlement, based on the State's promise.[40]

Like the Michigan circuit court, we believe that health insurance benefits must be allowed to change as health care evolves. We also believe that the economic realities of administering health care coverage would prevent making such changes if an individualized equivalency analysis were used. We reach this conclusion reluctantly in light of *Hoffbeck's* holding that changes in other retirement benefits must be analyzed on an individual basis, a result that is implied by article XII, section 7, which equates retirement benefits with contract rights. Recognizing that analysis of health insurance changes from a group standpoint is necessary, but in some degree inconsistent with analogous constitutionally based precedent, we believe that it is advisable to express a

---

36. *Id.* at 616.

37. *Id.*

38. *Studier v. Michigan Pub. Sch. Employees Ret. Bd.,* File 00–92435–AZ, Circuit Court for Ingham County, Michigan, pp. 17–18 (Order of 2/21/01).

39. *Id.* at 19

40. *Id.* at 20.

number of cautions that may help to guide any equivalency analysis of health coverage changes.

At the outset, we reiterate *Hoffbeck's* admonition that equivalent value must be proven by reliable evidence. Just as with an individual comparative analysis, offsetting advantages and disadvantages should be established under the group approach by solid, statistical data drawn from actual experience—including accepted actuarial sources—rather than by unsupported hypothetical projections.[41] We also believe that, apart from the individualized approach, the other guidelines concerning equivalency analysis set out in *Hoffbeck* should continue to be generally applicable.[42] Further, we reiterate that equivalent value must be proven by a comparison of benefits provided—merely comparing old and new premium costs does not establish equivalency.[43]

Where there is an individual showing that a change results in a serious hardship that is not offset by comparable advantages, the affected individual should be allowed to retain existing coverage. This is suggested by a distinction between *Hoffbeck* and the present case. In *Hoffbeck* the detrimental change resulted in clear and specific "serious hardship" to certain individuals.[44] By contrast, the examples that have been offered in the present case amount to detriments of at most several hundred dollars a year, without consideration of benefits. We believe that if there were an individual showing that substantial detriments were not offset by comparable advantages and that this resulted in a serious hardship, the affected individual should be protected from the change by article XII, section 7. Further, our opinion in this case should not be interpreted as approving major deletions in the types of coverage offered during an employee's term. Coverage of a particular disease or condition should not be deleted, even though other coverage might be improved, if the deletion would result in serious hardship to those who suffer from the disease or condition in ques-

tion. Moreover, if there should be changes that will predictably cause hardship to a significant number of beneficiaries who cannot at the time of the change be specifically identified, we believe that the option of providing an election to beneficiaries to retain existing coverage should be available, at least in the absence of a showing by the state of a compelling need for the change and the impracticability of providing for an election. Finally, changes that substantially reconfigure the mix of benefits to beneficiaries should be approved only upon a strong showing of justification. Unusual gaps in coverage should be avoided. Like the Michigan court in *Studier,* we believe that the coverage that is offered should generally be "in keeping with the mainstream" of health insurance packages offered to active public employees in terms of scope and balance.

## V. CONCLUSION

The superior court's decision granting summary judgment to the retirees is AFFIRMED insofar as it holds that health insurance benefits are benefits protected by article XII, section 7, and that it is the benefits themselves during the period of employment rather than the cost of the benefits during the same period that receive constitutional protection. The decision is REVERSED insofar as it holds that the comparative analysis of the disadvantages and compensating advantages of changes to health insurance is to be made by focusing on individuals rather than the entire group of employees. The superior court's conclusion that the changes under review violate article XII, section 7 of the Alaska Constitution is therefore VACATED and this case is REMANDED for further proceedings consistent with this opinion.

FABE, Chief Justice, not participating.

### Appendix

**Discussion**

Plaintiff-retirees['] class action complaints against Defendants Poe, Bell, and the State

---

41. *Hoffbeck,* 627 P.2d at 1058.

42. *See supra* note 26.

43. *See* the discussion in part IV.C, *supra,* at 11–12.

44. 627 P.2d at 1058.

(hereinafter collectively referred to as the "State") allege that the State modified medical benefits available to retired public employees, and that this modification diminished or impaired the benefits they received upon retirement. Plaintiffs seek declaratory and injunctive relief against the State for alleged breach of contract, breach of fiduciary duty, and violation of constitutional protection.

This matter presents to the court an unavoidable constitutional issue. Plaintiffs' main argument is that retiree medical benefits are a vested contractual right protected by Article XII, Section 7 of the Alaska Constitution, which provides:

> Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.

The State argues that the medical benefits in question are not retirement benefits protected by the Constitution. The State also argues that even if such benefits are constitutionally protected, it may modify the health plans, and that the court must evaluate the plans *as a whole* to ensure that the modifications are balanced (i.e. favorable changes offset disadvantageous modifications). (Def.'s Mem. in Supp. Mot. for Summ. J. at 23.)

Plaintiffs argue that *Hammond v. Hoffbeck*, 627 P.2d 1052 (Alaska 1981), controls this matter. In *Hoffbeck*, several statutory amendments were made to PERS in 1976. These changes had the effect of reducing the occupational disability benefits of public safety employees from 67% to 40% of monthly salary for occupational disability, and reduced occupational death benefits from 100% to 40% of monthly salary at death.

The Alaska Supreme Court held in *Hoffbeck* that "accrued benefits" (as stated in the Alaska Constitution) is the same as "vested benefits." *Hoffbeck* at 1057. The *Hoffbeck* court held that Article XII, Section 7 of the Alaska Constitution mandates that retirement benefits are regarded as an element of the bargained-for consideration given in exchange for an employee's assumption and performance of duties as a state employee. *Id.* The court further held that rights in PERS vest on employment. *Id.*

In addition, the *Hoffbeck* Court ruled that any disadvantageous changes in a pension plan must be accompanied by comparable new advantages. *Id.* The court also ruled that the determination of whether vested benefits have been diminished must be made on a case-by-case basis. *Id.* at 1059.

Plaintiffs argue that the *Hoffbeck* Court adopted a broad view of what constitutes a vested retirement benefit. This court agrees. The *Hoffbeck* Court applied the "plain meaning" of Article XII, Section 7 of the Constitution and determined that the changes made to the retirement benefits were unconstitutional. This court is bound to do the same.

The State argues that the medical plans in question are not benefits, but merely health insurance. (Def.'s Mem. in Supp. Mot. for Summ. J. at 16–17, 23.) Therefore, according to the State, the issue is what services are available to members, not what services a person might need from one year to the next. The State argues that depending on one's health, costs for an individual will vary from year to year. The State contends that major medical insurance does not equate to free medical care. Defendants assert that the court must look at the plan as a whole, balancing the availability of benefits to a member, not the actual use at the moment which they are implemented. (Def.'s Mem. in Supp. Mot. for Summ. J. at 23.)

We disagree with the State's argument. The plain meaning of "retirement systems" includes medical benefits. Retirement systems are typically considered to be a *package* of available services/benefits, not simply the monthly "pension" check. In contrast, the State argues that the court should look only at the dollar amount it contributes to the retirees' medical benefits. The State argues that since it still pays the same amount towards health benefits, the allocation of that amount among the components of the health plan is irrelevant. The State argues that it has the power to change the health plans as long as disadvantageous changes are offset

by advantageous changes and the total contribution or cost to the State does not decrease. (Def.'s Mem. in Supp. Mot. for Summ. J. at 23.)

*Hoffbeck* does not support the State's argument. The *Hoffbeck* Court applied the plain meaning of the constitutional provision. In the present matter, using the plain meaning approach, the medical plans in question are part of the constitutionally protected retirement benefits. *Hoffbeck* and its progeny [3] dictate to this court that a determination of whether vested rights to retirement benefits have been diminished must be made by the affected individual on a case-by-case basis. *Hoffbeck* at 1059. Such an individual analysis implies that the retirement benefits protected by the Constitution are more than the overall cost of the plan. *Hoffbeck's* recognition that retirement benefits are to be regarded as "an element of the bargained-for consideration given in exchange for an employee's assumption and performance of the duties of his employment" and should "reflect[ ] the realities of public employment in Alaska," also support this conclusion. *Id.* at 1056–57.

Other jurisdictions have addressed the issue of the extent that retirement benefits are protected under state constitutions.[4] The State argues that New York has addressed the issue presented before this court and relies on *Lippman v. Board of Education of the Sewanhaka Central High School District,* 66 N.Y.2d 313, 487 N.E.2d 897, 496 N.Y.S.2d 987 (1985). In *Lippman,* the New York Court of Appeals ruled that the medical benefits in question were not protected under its constitutional provision similar to Article XII, Section 7 of the Alaska Constitution.

The *Lippman* Court found that "health benefits" were not "retirement benefits" as that term is used in the New York Constitution, noting that the constitutional provision "protects only the benefits of membership in a retirement system; other employment conditions, though they may be protected by statute, resolution or individual collective bargaining agreement, are not within its coverage." *Id.* at 317, 496 N.Y.S.2d 987, 487 N.E.2d 897. The court noted that the health insurance premium payment provision is contained not in the New York Retirement and Social Security Law, but in the State's Civil Service Law. This is not the case in Alaska where the right to medical benefits is included in Title 39. This court declines to follow *Lippman,* because *Lippman* involved a medical plan that was separate from the state retirement system. As discussed previously, Alaska's retirement system includes a system of retirement benefits that include more than just a pension.

The State also argues that this court be guided by how health benefits are treated under the federal Employment Retirement Income Security Act ("ERISA"). The State refers to *In Re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation,* 58 F.3d 896 (3d Cir.1995), in which the court held that Congress did not impose automatic vesting of welfare benefit plans. Under ERISA a distinction is made between "pension plans" and "welfare plans," and medical benefits fall into

---

**3.** *See State ex. rel. Hammond v. Allen, et al.,* 625 P.2d 844 (Alaska 1981) (finding that the Alaska Constitution protected repealed retirement system program); *Sheffield v. Alaska Public Employees' Association, Inc.,* 732 P.2d 1083 (Alaska 1987) (finding that adoption of new actuarial table for early retirement benefits was unconstitutional and applied *Hoffbeck's* diminution of benefits on a case-by-case basis); *Municipality of Anchorage v. Gallion,* 944 P.2d 436 (Alaska 1997) (prohibiting joinder of weaker retirement plan with existing plans); and *Flisock v. State of Alaska,* 818 P.2d 640 (Alaska 1991) (holding that retirement benefits vest upon enrollment into the retirement system).

**4.** *See Betts v. Board of Administration of the Public Employees' Retirement System,* 21 Cal.3d 859, 582 P.2d 614, 148 Cal.Rptr. 158 (1978) (California Supreme Court ruling that "limited vesting" approach allows reasonable modification of the employee's vested pension rights); *Musselman v. Governor,* 450 Mich. 574, 545 N.W.2d 346 (1996) (Michigan Supreme Court divided whether health benefits fall within the protection of the state constitution); *and Lippman v. Board of Education of the Sewanhaka Central High School District,* 66 N.Y.2d 313, 487 N.E.2d 897, 496 N.Y.S.2d 987 (1985) (New York Court of Appeals finding that health benefits independently funded are not protected within state constitution).

the latter category. There is no basis for such a distinction under Alaska law.[5]

*Municipality of Anchorage v. Gentile*, 922 P.2d 248 (Alaska 1996)[,] is the only other case in Alaska that addressed the issue of whether Article XII, Section 7 of the Alaska Constitution protected retiree *medical* benefits. In *Gentile*, the issue was whether the Municipality of Anchorage ("MOA") and its public safety employees intended collective bargaining agreements to vest post-retirement medical benefits at retirement. The *Gentile* Court ruled that "since PERS benefits are vested," it as fair for the trial court to infer that the parties also intended the medical benefits to vest. *Id.* at 258. Accordingly, Plaintiffs argue that any benefit derived from membership in PERS and TRS is a vested right, including medical benefits.

The Alaska Supreme Court decided the *Gentile* matter using contract law, based on explicit contracts: the collective bargaining agreements, and did not reach the constitutional issue presented here.[6] The trial court in *Gentile*,[7] however, ruled, "Post-retirement medical coverage is provided to the vast majority of MOA employees under [PERS]. Those benefits may not be diminished subsequent to retirement under Article XII Section 7 of the Alaska Constitution." Plaintiffs argue that the Supreme Court's opinion in *Gentile* implies that medical retirement benefits are constitutionally protected. While this court is not bound by the trial court's opinion in *Gentile*, nor by dicta in the Supreme Court's affirming of that case, this court does find both decisions to be significant and persuasive.

This court is bound under *Hoffbeck* to apply the natural meaning of "retirement systems" to include medical benefits. Accordingly, any changes in the medical plans that operate to an employee's disadvantage must be offset by a comparable new advantage to that employee. *Hoffbeck*, 627 P.2d at 1057. A determination of whether vested rights to benefits have been diminished must be made on a case-by-case basis. *Id.* at 1059.

Defendants strongly argue that changes to the plans that benefit employees offset any changes that are disadvantageous to employees. Defendants' argument appears similar to the hypothetical data used by the State in *Hoffbeck* in its attempt to justify the changes to the benefits at issue there. *See* 627 P.2d at 1058. The *Hoffbeck* Court rejected this approach noting that " 'the comparative analysis of disadvantages and compensating advantages must focus on the particular employee whose own vested pension rights are involved,' ... and not on hypothetical cases." *Id., quoting Betts v. Board of Administration of the Public Employees' Retirement System*, 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614, 617 (1978). While adjustments to the retirement system that satisfy this test may be constitutionally implemented under *Hoffbeck*, no such adjustments have ever been upheld by the Alaska Supreme Court under this test.[8]

Plaintiffs have submitted affidavits[9] from several class members demonstrating that "at least as to some individuals, the new system cannot be said to offer advantages which outweigh its obvious disadvantages." *Hoffbeck, supra*, 627 P.2d at 1058. This court finds that the changes to the medical benefits system violate Article XII, Section 7

---

**5.** Thus for example, disability benefits are considered to be part of a welfare plan under ERISA and thus not subject to vesting. 58 F.3d at 901. *Hoffbeck*, however, specifically concerned a reduction in disability benefits.

**6.** *See Municipality of Anchorage v. Gentile*, 922 P.2d 248 (Alaska 1996) (Note 13 states, "The trial court held that by diminishing the medical benefits, MOA violated article XII, section 7 of the Alaska Constitution. Because the class members' contract claim fully resolves the question of whether the medical benefits vested when the covered employees retired, it is unnecessary to consider claimants' constitutional claim.").

**7.** *John M. Gentile, et al. v. Municipality of Anchorage*, Case No. 3AN–92–9377 CI (Superior Court June 25, 1993).

**8.** *See Hoffbeck, supra*, and cases cited in footnote 3, *supra*.

**9.** *See* Aff. [E.P.S.], Ex. 10; Aff. [R.J.D.], Ex. 11; Aff. [T.S.], Ex. 12; Aff. [C.E.], Ex. 13; Aff. [B.D.], Ex. 15; *and* Aff. [S.T.], Ex. 16., attached as exhibits to Pls.' Mem. in Supp. Mot. for Summ. J.

of the Alaska Constitution, at least as to those class members who are adversely affected by them.