Honorable Jay S. HAMMOND, Governor, State of Alaska; B. B. Allen, Commissioner, Department of Administration, an agency of the State of Alaska; Public Employees' Retirement System Board, an agency of the State of Alaska; and State of Alaska, Appellants,

v.

Joseph D. HOFFBECK, President, Public Safety Employees' Association, Inc., a nonprofit corporation; and Public Safety Employees' Association, Inc., a nonprofit corporation, Appellees.

No. 4742.

Supreme Court of Alaska.

May 8, 1981.

Rodger W. Pegues, Asst. Atty. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for appellants.

William K. Jermain, Jermain, Dunnagan & Owens, Anchorage, for appellees.

Before RABINOWITZ, C.J., CONNOR, BURKE and MATTHEWS, JJ., and DI-MOND, Senior Justice.

## OPINION

RABINOWITZ, Chief Justice.

In 1975, the State Department of Administration commissioned an actuarial study of the Alaska Public Employees' Retirement System (hereinafter PERS). The results of that study led, in 1976, to several amendments to the statutory scheme underlying PERS. Ch. 123 S.L.A. 1976. Among those amendments were provisions which eliminated the distinction the system had previously made between public safety employees—

police officers and fire fighters—and other participants in PERS. The new provisions had the effect of 1) reducing the occupational disability benefits of public safety employees from two thirds to forty per cent of monthly salary at the time of disability,[1] 2) requiring that an employee be totally unemployable in order to be eligible for an occupational disability pension rather than "incapacitated for service in the position held" as had previously been the case,[2] and 3) reducing occupational death benefits from one hundred per cent to forty per cent of monthly salary at the time of death.[3]

1. Prior to the 1976 amendments, AS 39.35.-410(d) provided:

>The monthly amount of an occupational disability pension for a peace officer or a fireman shall be two-thirds of his gross monthly compensation at the time of his disability. For any other employee it shall be determined in accordance with § 370(c) of this chapter, considering (1) the employee's compensation before his termination of employment, and (2) either the credited service that would have been accumulated if the employee's employment had continued until his ·55th birthday after his disability or his actual credited service before his disability, whichever is greater; except that the amount so determined shall be reduced by assuming that a joint and survivor option of 75 per cent became immediately effective upon retirement, with the employee's spouse as contingent beneficiary. If no spouse exists at the time of actual retirement, the pension shall not be reduced.

As amended, AS 39.35.410(d) reads:

>The monthly amount of an occupational disability pension is 40 per cent of the disabled employee's gross monthly compensation at the time of termination due to disability.

2. Prior to amendment, AS 39.35.410(g) provided:

>A retired employee receiving an occupational disability pension shall be required, as often as the administrator considers advisable, but not more frequently than once a year, to undergo a medical examination at a place determined by the administrator and by a physician or physicians engaged by the administrator. If, in the judgment of the administrator, the examination indicates that the retired employee is no longer incapacitated for service in the position held at the time his disability pension began, payments of his disability pension shall cease. The employee shall then be reappointed to a position of the same classification in which he was employed at the time of his disability if he still meets all other necessary requirements for that position, unless he elects to receive an early retirement pension in accordance with (c) of this section. In any event the disability pension shall not cease until the employee is either reappointed, retired or otherwise disqualified from receiving a benefit by being disqualified for reappointment.

Following the 1976 amendment, that section read:

>A disabled employee receiving an occupational disability pension shall provide the administrator, one year after appointment to disability retirement and once each year thereafter until disability benefits cease, proof of continuing eligibility to receive disability payments under the Social Security Act. If a disabled employee is otherwise ineligible for social security, he shall provide the administrator with sufficient medical evidence once each year to demonstrate that disability benefits under the Social Security Act would be payable had the employee been otherwise eligible. If the disabled employee fails to provide the administrator with evidence of continuing eligibility for disability payments under the Social Security Act or other medical evidence required by the administrator within 30 days following each anniversary date, the disability payments from the system shall cease. If that information is subsequently provided to the administrator, payments will resume beginning for the month following that in which the information is provided. When disability payments under the Social Security Act cease, it is the responsibility of the disabled employee to notify the administrator immediately. Upon notification, the administrator shall cease making disability payments.

Further amendments to this subsection were made in 1977, but they are irrelevant to our purposes here. Ch. 128, §§ 38, 39, S.L.A.1977. "Disability" as used in the Social Security Act means "inability to engage in any substantial gainful activity." 42 U.S.C.A. § 416(i)(1)(A) (West 1974).

3. Prior to 1976, AS 39.35.430(a) & (b) provided:

>(a) If (1) the death of an employee, other than a peace officer or a fireman, occurs before his retirement and before his normal retirement date, and (2) the proximate cause of death is a bodily injury sustained or a hazard undergone while in the performance and within the scope of the employee's duties, and (3) the injury or hazard is not the proximate result of the wilful negligence of the employee, the surviving spouse of the employee is eligible for a surviving spouse's pension until remarriage. The monthly amount of the surviving spouse's pension shall be equal to the amount the surviving spouse would have received if the employee

In 1978, the Public Safety Employees' Association, Inc. (hereinafter Association) and Joseph D. Hoffbeck, as president of the Association, filed suit alleging these specific provisions to be unconstitutional and seeking a declaratory judgment to that effect as well as injunctive relief. The superior court granted summary judgment in the Association's favor and this appeal followed.

Article XII, section 7, of the Alaska Constitution reads:

> *Retirement Systems.* Membership in employee retirement systems of the State or

its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or impaired.

The parties are in general agreement as to the proper interpretation of that provision and the law that governs its application. Recognizing that there is a division of authority on the question of whether an employee's rights to benefits under systems like PERS vest[4] on employment and enrollment in the system or only at the time when an employee becomes eligible to receive those benefits,[5] all parties urge that the former view be adopted.[6]

---

had retired because of an occupational disability immediately before his death. If the surviving spouse remarries or if there is no surviving spouse, the survivor's benefit shall be paid in equal parts to the children of the employee, including those adopted, who are either under 18 years old or under 23 years old and registered at and attending on a full-time basis an accredited educational or technical institution recognized by the Department of Education.

(b) If (1) the death of a peace officer or a fireman occurs before his retirement and before his normal retirement date, and (2) the proximate cause of death is a bodily injury sustained or a hazard undergone while in the performance and within the scope of his duties, and (3) the injury or hazard is not the proximate result of the wilful negligence of the employee, a monthly survivor's pension equal to his monthly compensation in the month in which he died shall be paid to his surviving spouse. If his surviving spouse remarries or if there is no surviving spouse, the monthly survivor's pension shall be paid in equal parts to the children of the employee, including those adopted, who are either under 18 years old or under 23 years old and registered at and attending on a full-time basis an accredited educational or technical institution recognized by the Department of Education. On the date the normal retirement of the employee would have occurred if he had lived, monthly payments shall equal the monthly amount of the normal retirement benefit to which the employee, had he lived and continued his employment as a peace officer or a fireman until his normal retirement date, would have been entitled with an average monthly compensation as existed at his death and the credited service which he would have had.

In 1976, section (a) was repealed, ch. 123, § 16, S.L.A. 1976, and section (b) was amended to read:

If (1) the death of an employee occurs before his retirement and before his normal retirement date, and (2) the proximate cause

of death is a bodily injury sustained or a hazard undergone while in the performance and within the scope of his duties, and (3) the injury or hazard is not the proximate result of wilful negligence of the employee, a monthly survivor's pension equal to 40 per cent of his monthly compensation in the month in which he died shall be paid to his surviving spouse. If there is no surviving spouse the monthly survivor's pension shall be paid in equal parts to the children of the employee, including those adopted, who are either under 19 years old or under 23 years old and registered at and attending on a full-time basis an accredited educational or technical institution recognized by the Department of Education. On the date the normal retirement of the employee would have occurred if he had lived, monthly payments shall equal the monthly amount of the normal retirement benefit to which the employee, had he lived and continued his employment until his normal retirement date, would have been entitled with an average monthly compensation as existed at his death and the credited service to which he would have been entitled.

Again, a subsequent amendment was made in 1977, irrelevant for our purposes here. Ch. 128, §§ 41, 42, S.L.A.1977.

**4.** We have previously held that the phrase "accrued rights" is synonymous with "vested" rights. *Bidwell v. Scheele,* 355 P.2d 584, 586 (Alaska 1960).

**5.** One commentator has described the diversity of judicial approaches to this problem as follows:

> It would be the exceptional employee who would think critically of his rights or expectancies as vested in the sense that they are beyond the power of legislative modification. At the same time it is not to be expected that they would react with unconcern to the no-

 We are of the view that the plain meaning of Alaska Const. Art. XII, § 7, as well as the purpose underlying its adoption,[7] compels such a conclusion.[8] Furthermore, a review of the relevant case authority from several jurisdictions[9] has persuaded us that this rule represents the better reasoned of the alternative approaches that have been adopted. The rule that regards members' rights in public employees' benefits systems as vested only at the time at which an individual employee is eligible to receive payment of those benefits necessarily depends in some degree upon

the anachronistic notion that such benefits are in the "nature of a bounty springing from the appreciation and graciousness of the sovereign." *Blough v. Ekstrom,* 14 Ill. App.2d 153, 144 N.E.2d 436, 440 (1957). *See* R. Cohn, *Public Employee Retirement Plans—The Nature of the Employees' Rights,* 1968 U.Ill.L.Forum 32, 61–62 (1968). Under the rule mandated by Alaska's Constitution, on the other hand, these benefits are regarded as an element of the bargained-for consideration given in exchange for an employee's assumption and performance of the duties of his employment. This approach, in our view, more accurately re-

tion that their 'rights' are simply gratuities which a gracious and beneficent governmental employer may confer, withhold, modify or repeal as the whim of an omniscient sovereign dictates. Yet such is the prevailing view in a majority of the states.

The minority jurisdictions are divided between the concept of contractual rights completely immunized from legislative impairment, and that of contractual or vested rights subject to a reserved legislative power to make reasonable modifications in the plan. Other conceptual variables exist, such as 'moral obligation' operating as an exception to the gratuity concept, and the 'corresponding benefit' principle which recognizes a reserved legislative power of modification of benefits if coupled with offsetting new benefits or liberalized qualifying conditions. Nor does this enumeration exhaust the prevailing rationales. Thus a vested status may attach after qualifying service conditions are met or after retirement, or the vested status may attach only 'as long as the fund exists and the pension law remains unrepealed.' Intertwined with these concepts and variations, but not uniformly applied, are considerations of the nature of the employees' participation in the fund. If voluntary and based upon the employees' election, the fund may be 'contractual' and the 'rights' vested; but if participation is compulsory, no contract status may be applied and the 'rights' are simply gratuities. In several states where the vested right philosophy prevails it is irrelevant that participation is mandatory or elective.

R. Cohn, *Public Employee Retirement Plans— The Nature of the Employees' Rights,* 1968 U.Ill.L.Forum 32, 33–34 (1968) (footnotes omitted). The approach which regards employee benefits as gratuities conferred by a beneficent sovereign is foreclosed by Alaska Const. Art. XII, § 7, which provides that "Membership in employee retirement systems ... shall constitute a contractual relationship." That constitutional provision leaves open for judicial deci-

sion only the questions of the point at which those contractual rights vest and the degree to which "vested" rights, in this context, are subject to legislative modification.

6. Appellants, however, would limit the applicability of this approach to benefits that involve payments to an employee; they therefore urge that death benefits should vest only at the time of an employee's death.

7. We concur in the Arizona Supreme Court's view that:

The governing principle of constitutional construction is to give effect to the intent and purpose of the framers of the constitutional provision and of the people who adopted it. Unless the context suggests otherwise, words are to be given their natural, obvious and ordinary meaning.

*County of Apache v. Southwest Lumber Mills, Inc.,* 92 Ariz. 323, 376 P.2d 854, 856 (1962) (en banc) (citations omitted).

In addition to the "natural, obvious and ordinary meaning" of Article XII, § 7, we rely on the commentary which accompanied the enactment of this provision, which reads:

*Employee's Retirement.* This will assure state and municipal employees who are now tied into various retirement plans that their benefits under these plans will not be diminished or impaired when the Territory becomes a state.

6 Proceedings of the Alaska Constitutional Convention, Appendix V (Committee Proposals & Commentary) at 140 (1955).

8. The New York Constitution contains a similar provision, which has been similarly interpreted by the New York courts. *Birnbaum v. New York State Teachers' Retirement System,* 5 N.Y.2d 1, 176 N.Y.S.2d 984, 152 N.E.2d 241, 245 (N.Y.1958).

9. *See* Annot., 52 A.L.R.2d 437 (1957 & 1980 Supp.) and cases cited therein.

flects the realities of public employment in Alaska.[10] We therefore hold that benefits under PERS are in the nature of deferred compensation and that the right to such benefits vests immediately upon an employee's enrollment in that system.

As Cohn points out, rigid adherence to labels like "gratuity," "compensation," "contract," and "vested rights" has not allowed courts the flexibility necessary to deal properly with legitimate legislative response to changing economic and social conditions. Cohn, *supra* n.5, at 40–51. *See also Spina v. Consolidated Police and Firemen's Pension Fund Commission*, 41 N.J. 391, 197 A.2d 169, 174 (1964). We find California's long experience with this problem, and its adoption of the "limited vesting" approach, to be instructive. *See Betts v. Board of Administration of the Public Employees' Retirement System*, 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614, 617 (1978). The California Supreme Court has described that approach as follows:

> An employee's vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible

change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.

*Allen v. City of Long Beach*, 45 Cal.2d 128, 287 P.2d 765, 767 (1955) (citations omitted). That court has also held, more recently, that:

> The comparative analysis of disadvantages and compensating advantages must focus on the particular employee whose own vested pension rights are involved. It has been said that the offsetting improvement must also 'relate generally to the benefit that has been diminished.'

*Betts v. Board of Administration of the Public Employees' Retirement System*, 21 Cal.3d 859, 148 Cal.Rptr. 158, 582 P.2d 614, 617–18 (1978) (citations omitted). We agree with this analysis and hold that the fact that rights in PERS vest on employment does not preclude modifications of the system; that fact does, however, require that any changes in the system that operate to a given employee's disadvantage must be offset by comparable new advantages to that employee.[11] Our task on this appeal, then, is to determine whether the three modifications of PERS attacked by the Association had disadvantageous effects on any of the

10. We agree with Cohn's description of the role benefit plans play in government employment:

The universally recognized primary objectives of retirement plans are to enable the employer to attract better employees, to reduce turnover, to facilitate orderly retirement of older employees, to retain valuable employees who might seek more productive employment elsewhere, and, most importantly from the employee viewpoint, to assure a measure of income upon retirement adequate to allow the annuitant to live in reasonable security. These objectives, of increasing importance in private employment, are even more critical in government personnel policy as, with few exceptions, government cannot compete with private industry salary levels, and must rely heavily upon the equalizing factor of an attractive and liberal retirement plan. Conceding the soundness of these premises, it is difficult to conceive of a legal

principle more in conflict with these objectives than that which defines a public employee's annuity as 'a bounty springing from the graciousness of the sovereign and [which] may be given, withheld, distributed or recalled at its pleasure.' One would be hard put to conceive a more effective impediment to governmental recruitment and retention of competent personnel than this gratuity concept of pensions.

Cohn, *supra* n.5, at 40–41.

11. We are not called upon to consider the problem, which has frequently arisen in other jurisdictions, presented by a pension fund that is insufficient to satisfy all employee claims brought under its provisions. We intimate no view as to the appropriate legal analysis of any legislative alteration in employee benefits systems made in response to such circumstances.

state employees on whose behalf it filed suit and, if so, to weigh those disadvantages against any advantages that may have accompanied them.

The reduction of disability benefits for police officers and fire fighters from two thirds to two fifths of the appropriate monthly salary figure clearly operated to the disadvantage of the public safety employees who were affected. The state points out, however, that prior to this change all workers' compensation awards recovered by disabled public safety employees were set off against these disability benefits, whereas under the new system all state employees are entitled to both workers' compensation and disability benefits. The state also notes that the time for receipt of benefits is accelerated. It argues that these changes are advantages to public safety employees which outweigh the disadvantage incurred in the reduction of monthly disability benefits payable under PERS. In support of this argument, the state offers a series of projected data based on hypothetical cases; all of these projections posit substantial workers' compensation awards and, consequently, all arrive at higher total disability benefit figures under the new system than under the old. These figures are irrelevant, in that "[t]he comparative analysis of disadvantages and compensating advantages must focus on the particular employee whose own vested pension rights are involved," *Betts*, 582 P.2d at 617, and not on hypothetical cases. Furthermore, they are quite deceptive, as is demonstrated by comparison with the data the state has offered which are based on actual cases; these data indicate that nearly half of the public safety employees receiving disability benefits prior to 1976 were awarded no workers' compensation benefits at all. In response, appellees have offered the affidavits of Charles Reed and John W. Elmore, both of whom suffered disabling injuries in the course of performing their duties as Alaska State Troopers, which demonstrate that, in those individual cases, serious hardship has resulted from application of the new system and that no corresponding advantages have reduced that hardship. The evidence adduced before the superior court clearly supports that court's finding that, at least as to some individuals, the new system cannot be said to offer advantages which outweigh its obvious disadvantages.

■ Under PERS as it existed when the employees represented by the Association in this appeal entered the system, a public safety employee was required to show only that he was "incapacitated for service in the position held," former AS 39.35.410(g), in order to demonstrate eligibility for disability benefits. The new system requires a showing of total disability before an employee is entitled to those benefits. *See* AS 39.35.410(g); 42 U.S.C.A. § 416(i)(1)(A) (West 1974). The Association has provided persuasive evidence of the disadvantages this change has imposed on Reed and Elmore; furthermore, we regard it as self-evident that this change will entail serious disadvantage in every instance of serious injuries to a public safety employee which leave the victim with sufficient physical faculties to perform some sort of remunerative task. Appellant concedes that these disadvantages are not offset by any comparable new advantage, but apparently contends that the standard by which eligibility for benefits is determined is not itself a "benefit to which PERS members had accrued rights." We are of the view that the vested benefits protected by Alaska Const. Art. XII, § 7, necessarily include not only the dollar amount of the benefits payable, but the requirements for eligibility as well. Accordingly, we regard appellants' argument on this point as without merit.

As to the reduction in death benefits, appellants' position is that such benefits do not vest until the death of the employee; again, the fact that this reduction involves a disadvantage which is not offset by a comparable advantage is beyond dispute.[12]

---

12. Although this point is not argued on appeal, appellants' hypothetical projections indicate that, in some cases, the reduced death benefit combined with a workers' compensation award

Appellants argue that death benefits are in the nature of bequests and that, therefore, survivors' interests, like the interests of heirs and legatees, do not vest until the death of the party whose membership in PERS generated the benefits. This argument misses the mark. It is not the vesting of survivors' benefits that is in issue; it is rather the vesting of employee benefits. The fact that part of an employee's benefit package is, effectively, a life insurance policy, the proceeds of which will never be received by the employee, does not make that whole package any less an element of the consideration that the state contracts to tender in exchange for services rendered by the employee. We are persuaded that this change, like the two others attacked by the Association, imposes disadvantages on an employee—in this case a reduction in the value of a benefit that is equivalent to a life insurance policy—which are not outweighed by comparable advantages.

■ It is clear, then, that all three changes in the public safety employees' benefits systems that are attacked by the Association in this appeal violate Alaska Const. Art. XII, § 7, as to those public safety employees who are adversely affected by them. We affirm the superior court's decision in this respect. But the superior court's holding was much broader: it declared that "[t]he 1976 amendments to PERS insofar as they affect peace officers are of no force and effect." We think that this holding fails to recognize that not all public safety employees have suffered a diminution in vested rights to PERS benefits.

■ We note, first, that a determination of whether vested rights to benefits have been diminished must be made on a case-by-case basis. *Betts v. Board of Administration of the Public Employees' Retirement System*, 21 Cal.3d 859, 148 Cal. Rptr. 158, 582 P.2d 614, 617 (1978). We

think this choice is best made by each affected individual. Second, we must, when possible, construe statutory provisions in such a way as to avoid unconstitutionality rather than simply void them on the basis of an interpretation which renders them constitutionally infirm. *See* 2A C. Sands, *Sutherland Statutory Construction* § 45.11 (4th ed. 1973); *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974). These principles require division of all public safety employees into three distinct groups: those who were employed before the effective date of the legislation in issue here and whose rights to benefits were diminished by the changes made; those who were employed before that date but who elect to be covered by the new legislation; and those who began their employment only after this legislation became effective. It is clear that the changes made in PERS did not unconstitutionally diminish any vested rights of members of the third group; as appellants point out, repeal of the old provisions made it impossible for the rights of employees hired on or after July 1, 1976, to vest under those provisions. As to the third group, then, the changes made in PERS are not violative of Art. XII, § 7. We therefore reverse the superior court insofar as it held that the 1976 amendments were prospectively invalid. We also hold that, as to the second group—which includes those public safety employees enrolled before July 1, 1976, who wish to be covered by the new legislation—the 1976 amendments were valid.[13] Our interpretation, then, renders the 1976 amendments considered here constitutional except as to public safety employees hired before July 1, 1976, who opt to receive benefits under the system in effect at the time they were hired.

The decision of the superior court is AFFIRMED insofar as it applies to public safety employees who were hired before July 1,

---

could provide survivors with increased benefits. This claim is speculative and, in any event, does not address those common cases in which the total benefits payable to survivors are substantially diminished.

13. Upon remand the state is to give requisite notice to and a reasonable time for all those public safety employees affected to exercise their right to choose which system they desire to come under.

1976, and who choose not to be covered by PERS in its amended form; it is REVERSED insofar as it applies to public safety employees hired before July 1, 1976, who elect to be covered by PERS as amended in 1976, and to all public safety employees hired on or after July 1, 1976.