*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF ADMINISTRATION, and ACTING COMMISSIONER AMANDA HOLLAND, in an official capacity, | ) ) ) ) ) ) |
| Appellant, | ) ) |
| v. | ) ) |
| THE RETIRED PUBLIC EMPLOYEES OF ALASKA, INC. | ) ) ) |
| Appellee. | ) ) |

Supreme Court No. S-17577

Superior Court No. 3AN-16-04537 CI

O P I N I O N

No. 7581 – January 21, 2022

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Katherine Demarest, Assistant Attorney General, Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellant. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, and Maassen, Justices, and Matthews and Eastaugh, Senior Justices.[*] [Carney and Borghesan, Justices, not participating.]

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

BOLGER, Chief Justice.
WINFREE, Justice, dissenting.

## I.     INTRODUCTION

Article XII, section 7, of the Alaska Constitution protects "[a]ccrued benefits" of public retirees from diminishment. The State redesigned the dental insurance plan offered to retirees in 2014, narrowing coverage but also decreasing premiums paid by retirees, and the Retired Public Employees of Alaska challenged the redesign. After a bench trial the superior court concluded that the new plan unconstitutionally diminished retirees' accrued benefits.

The State appeals, arguing that the superior court erred by determining the dental plan was a constitutionally protected "accrued benefit" and by refusing to consider premium rates for retirees as relevant to the diminishment analysis. We agree with the State on the second point only. The Alaska Constitution does protect public retirees' option to purchase dental insurance as an accrued benefit, but both coverage for retirees and price to retirees influence the value of this option. Therefore, we vacate and remand for the superior court to reevaluate the plan changes and incorporate premium pricing into its analysis.

## II.    FACTS AND PROCEEDINGS

### A.     Since 1979 The State Has Offered Its Retirees The Option To Purchase Dental Insurance; A 2014 Plan Revision Narrowed Coverage While Reducing Premiums.

State employees and retirees are members of the Alaska Public Employees Retirement System (PERS).[1] Enrollment in PERS is generally a condition of public

---

[1]     *See* AS 39.35.001 (establishing PERS to encourage hiring and retention "by establishing plans for the payment of retirement, disability, and death benefits to or on behalf of the members").

employment.[2] The State has provided medical insurance benefits to various tiers of PERS members ever since the Alaska Legislature required the State to do so in 1975.[3]

In 1979 the Legislature also authorized the State to begin offering dental insurance to public retirees.[4] Under the current statute, the State "may obtain" a group insurance policy covering PERS members that provides audio, dental, and vision insurance subject to various conditions.[5] These conditions include requirements that each participating governmental unit individually decide to opt-in and that any members electing to participate pay the cost of the dental insurance.[6]

Since 1979 the State has provided PERS beneficiary recipients the option to participate in a Dental-Visual-Audio (DVA) plan with premiums paid by the recipients.[7] Implementing regulations adopted by the Division of Retirement and

---

[2]    *See* AS 39.35.120 (requiring inclusion in the defined benefits retirement plan for most State employees); AS 39.35.720 (requiring inclusion in the defined contribution retirement plan for most State employees hired on or after July 1, 2006).

[3]    *See* Ch. 200, §§ 1-2, SLA 1975 (codified as amended at AS 39.35.535) ("Each person who is entitled to receive a monthly benefit from the retirement system *shall* be provided with major medical insurance coverage." (emphasis added)). Certain categories of members need not pay premiums to receive this coverage, but others do. AS 39.35.535(c)(2).

[4]    Ch. 55, §1, SLA 1979 (codified as amended at AS 39.30.090).

[5]    AS 39.30.090(a)(10) (providing that "[t]he Department of Administration may obtain a policy or policies of group insurance" and "a person receiving benefits under AS 14.25, AS 22.25, AS 39.35, or former AS 39.37 may obtain auditory, visual, and dental insurance").

[6]    AS 39.30.090(a)(3) (requiring unit opt-in), (10) (specifying "a person electing to have insurance under this paragraph shall pay the cost of the insurance").

[7]    When applying for retirement, employees mark a box to indicate whether
(continued...)

Benefits provide that "[a] benefit recipient may elect to obtain [DVA] insurance,"[8] but failure to timely apply to do so "will result in the loss of all rights to apply for or obtain [DVA] insurance under this chapter."[9]  A benefit recipient who subsequently fails to make premium payments also "forfeits the right to participate in the plan."[10]  Another regulation cautions:  "When necessary to maintain the financial integrity of the [DVA] plan, the administrator may change the premiums and the terms of coverage."[11]

In keeping with these regulations, communications from the State to its employees have consistently portrayed its dental insurance plan as available to any employee who upon retirement elects to participate and pays the associated premiums. These publications speak of employees' "right[s] to elect coverage" and, once enrolled, their "rights to future coverage."

The 1979, 1984, 1985, and 1989 booklets all promise that the DVA coverage for recipients who elect to participate "will continue . . . as long as [they] are eligible to receive a monthly benefit" from PERS and "the premiums are continuously paid" by the recipients.  The 1984 booklet specifies that "coverage will consist of the benefits described in this booklet."  The 1989 booklet warns that "[t]he cost of this insurance is subject to change each year."

---

[7]    (...continued) they choose to enroll in the DVA plan.

[8]    2 Alaska Administrative Code (AAC) 39.210(a) (2021).

[9]    2 AAC 39.220(e).

[10]    2 AAC 39.240(b).

[11]    2 AAC 39.280.  The "administrator" is defined as "the director of [the division] or their designee."  2 AAC 39.290(1).

The booklets published between 1990 and 2014 all caution that "[t]hese benefits may change from time to time" before summarizing the available dental coverage. But these booklets still specify that a recipient's coverage shall end only if that recipient fails to pay the required premium, decides to discontinue participation, or becomes ineligible to receive PERS benefits in general. And they still speak in terms of retirees' "rights to future coverage" or their initial "right[s]" to purchase coverage.

From 2000 to 2013, the monthly premiums retirees paid for individual DVA coverage rose from 41 to 70 dollars. As a result of these increases, which mirrored the rising cost of care, the State decided to substantially revise the terms of the DVA plan. The new dental plan (the 2014 plan) took effect January 1, 2014, replacing the previous plan (the 2013 plan).

Significant structural changes in the 2014 redesign included reducing payments to out-of-network providers in order to incentivize use of in-network providers and adding frequency, age, or other types of limitations to many services. The revisions entirely eliminated coverage for 7 services,[12] narrowed coverage for 21 services,[13] had

---

[12]     These eliminated services were diagnostic casts and study models, topical fluoride for adults without specified dental conditions, palliative emergency care, apicoectomy, periodontal splinting, gold foil restoration, and inlays.

[13]     The 2014 plan added frequency, age, or other types of limitations to 21 services (oral exams, diagnostic x-rays, routine full-mouth x-rays, routine bite-wing x-rays, prophylaxis, periodontal maintenance, space maintainers, repairing bridges and dentures, extractions and other oral surgery, root canals and retreatment, pulp capping, periodontal scaling and root planing, full-mouth debridement, anesthesia, crowns and onlays, bridges, full dentures, partial dentures, adjusting dentures, replacing dentures, and tissue conditioning). The plan also decreased coverage levels for 2 of these services such that they would cost the recipient more (adjusting dentures and repairing bridges and dentures).

an indeterminate effect on 4 services,[14] left unchanged 3 services,[15] and resulted in more favorable coverage for only 1 service (athletic mouth guards). The modifications yielded a 10% decrease in premiums; for instance, the monthly premium for a retiree paying for individual DVA coverage decreased from 70 to 63 dollars.

**B.** **The Superior Court Concluded The 2014 Plan Violated The Alaska Constitution By Diminishing Retirees' Benefits.**

The Retired Public Employees of Alaska (RPEA)[16] filed a complaint against the State in January 2016, alleging that the 2014 plan adoption violated article XII, section 7 of the Alaska Constitution by diminishing the accrued benefits of employees hired by the State before 2014. RPEA's complaint sought a declaratory judgment recognizing the DVA plans as an accrued benefit and the 2014 changes as an unconstitutional diminishment of that protected benefit, as well as injunctive relief requiring the State to either reinstate the 2013 plan or adopt an equivalent plan for employees hired before 2014.

Both parties moved for partial summary judgment on whether the optional, retiree-funded DVA insurance plan qualified as an accrued benefit constitutionally protected from diminishment. The superior court granted RPEA's motion and denied the State's, concluding that the DVA benefits were constitutionally protected from diminishment. The court denied the State's request for reconsideration, explaining that

---

[14] For one service (implants), the new plan removed a limitation, and for another service (sealants), it removed one limitation while adding another. The redesign added limitations on two other services (periodontal maintenance and space maintainers) while simultaneously making them cost less to the recipient by increasing their coverage levels.

[15] These unchanged services were fillings, brush biopsy, and nitrous oxide.

[16] RPEA is a nonprofit corporation with the purpose of educating retirees from State employment about their benefits and assisting them in obtaining those benefits.

"[a]lthough retirees self-fund their DVA coverage, the option to buy the insurance is still part of the benefit they are offered at the time of employment."

The court analogized the State's offer to provide DVA insurance to retirees who choose to participate and pay the premium to an option contract. The court acknowledged that no statute required the State to offer DVA coverage to its employees, but reasoned that since the State did offer this coverage, the employees "have [the] right to take advantage of that" by purchasing DVA insurance based on the terms in existence when they were hired. The court determined that this right vested when the employee became employed and enrolled in the system, not when the employee retired and purchased the insurance. The option to purchase DVA insurance was therefore constitutionally protected from diminishment.

A bench trial ending in July 2018 addressed whether the 2014 plan diminished retirees' benefits in comparison to the 2013 plan. RPEA presented two witnesses who explained the plans' terms. Exhibits introduced by RPEA detailed the claims denied in 2014, 2015, and 2016 under the 2014 plan. A dentist and a periodontist explained the medical necessity and recommended frequency of 14 services limited by the 2014 plan.

RPEA also presented an expert in benefits plan evaluations who opined that based on the 2014 plan's imposition of frequency, age, and other limits, the 2014 revisions overall diminished the plan's value. But the expert also stated that when evaluating a plan, he usually surveyed the beneficiaries to learn their preferences, considered the premiums, and weighed estimates of costs in coming years as calculated by an actuary; he admitted that he had taken none of these steps when comparing the 2014 and 2013 plans. Nor did RPEA's expert consider how many or how often

beneficiaries used any of the services, or how much they paid when using them.[17] Instead, the expert essentially formed his opinion by counting the number of services for which the 2014 revision decreased rather than increased coverage.

The division's chief health policy administrator testified for the State that the 2014 redesign was intended to eliminate coverage for unnecessary services and to control costs to rein in rising premiums, while meeting or exceeding industry standards. She explained that the State seeks to keep premiums low in order to attract healthy participants and keep the participating population broad, preserving the plan's stability. An expert witness for the State in dental benefit plan design and analysis also testified to the importance of keeping premiums low for voluntary, beneficiary-funded plans to avoid the risk of an "actuarial death spiral" leading to plan failure.[18]

The State also presented a witness qualified as an expert in actuarial valuation of health benefit plans. The State's expert estimated the actuarial value[19] of the 2014 plan to be either 2.4% or 6.1% higher than the 2013 plan, as measured by the

---

[17] A utilization report from the third-party administrator showed a higher rate of services used per member under the 2014 plan than the 2013 plan.

[18] The expert testified that as premiums rise in a beneficiary-funded, voluntary plan, dentally healthy people who need less care tend to drop out. If this adverse selection continues, the plan population will skew towards people who use the dental benefits heavily, risking an "actuarial death spiral" in which rising costs necessitate rising premiums, resulting in a further exodus of healthy people in a self-perpetuating cycle leading to plan failure.

[19] The expert defined actuarial value of a health insurance plan as "the average share of medical spending that is paid by the plan as opposed to being paid out of pocket by the consumer." Actuarial value thus measures the practical dollar value of the coverage itself, incorporating cost-sharing measures like deductibles and co-payments, but excluding premiums and intangible benefits of a plan such as the ability to freely choose one's own provider.

proportion of costs paid by the average member in 2014 as opposed to 2013. But the superior court rejected this expert's valuation as unreliable for a number of reasons. For instance, even though out-of-network claims made up 27% of all claims in 2014, the expert's valuation of the 2014 plan excluded them. Since a 2014 plan member generally must pay a higher proportion of the cost for out-of-network claims, this omission likely overstated the 2014 plan's actuarial value.

The superior court also disregarded the testimony of the State's expert in part because he relied solely on the plan booklet in forming his opinion. The superior court accepted RPEA's evidence that coverage under the 2013 plan included several services not specifically mentioned in the plan booklet. The superior court also found credible RPEA's expert witness testimony "that many of the 2014 changes deny coverage for dentally necessary care, where such coverage was available under the 2013 plan."

The superior court ruled in favor of RPEA in April 2019. It interpreted the anti-diminishment provision in the Alaska Constitution to protect "retirees' benefits, not the premium paid for the benefits . . . regardless of who pays the premium." And it concluded that the State's 2014 plan violated the Alaska Constitution by diminishing the benefits available to retirees in comparison to the 2013 plan.

Specifically, the court found the 2014 plan diminished coverage for 24 services and enhanced coverage for only 3 services. The court asserted that rather than merely counting up these changes, it had "considered the magnitude of each change, the number of members affected by the changes, the fact that two of the enhancements are in themselves a mix of an enhancement . . . and a diminishment," and "the fact that the only unequivocal enhancement (coverage for athletic mouthguards) is of limited

utility to a largely retired population."[20] The court also found "the loss of the freedom to choose one's dental provider without financial penalty" impaired benefits. And the court determined that because the reduction in coverage was so clear from the plan terms, its finding of diminishment did not need to be supported by quantitative or actuarial analysis.

The superior court awarded RPEA "its full reasonable costs and attorney['s] fees" as a prevailing constitutional litigant.[21] In addition to the recovery authorized by Alaska Civil Rule 79,[22] RPEA requested another $51,758.75 in "other reasonable costs." The State opposed this request. The superior court awarded RPEA all requested attorney's fees and costs.

The superior court's April 2019 order declaring the 2014 changes to the retiree dental plan unconstitutional "enjoin[ed] the State from continuing to offer the 2014 retiree dental plan as the only dental plan available to retirees," and the superior court entered final judgment in favor of RPEA in August. In September RPEA filed a motion to enforce the April order and "related relief" which the State opposed as an untimely attempt to alter the court's final judgment.[23] The superior court granted two

---

[20] The clearest indication that the superior court actually considered the number of members affected by the changes was the court's finding that, after the 2014 plan decreased coverage for fluoride, approved claims for fluoride for adults dropped by over 5,750: from over 7,000 in 2013 to under 1,250 in 2014.

[21] AS 09.60.010(c) directs the superior court to award "full reasonable attorney['s] fees and costs" to a party that has prevailed in asserting a right under the United States Constitution or the Alaska Constitution.

[22] Alaska R. Civ. P. 79(f) lists "the only items that will be allowed as costs" recoverable by the prevailing party.

[23] Alaska R. Civ. P. 59(f) requires all motions to alter or amend a judgment

(continued...)

further forms of relief: It (1) prohibited the State from treating the 2014 plan as the default choice for retirees during the 2020 open enrollment period and (2) directed the State "to conduct a complete retrospective review of claims denied under the 2014 plan that would have been granted had the 2013 plan remained in effect."

The State now appeals from the superior court's conclusions that the DVA plan was a constitutionally protected accrued benefit and that the 2014 plan diminished this benefit. The State also contests the court's award of attorney's fees and costs beyond those specified in Rule 79 and the grant of additional injunctive relief after entry of final judgment.

## III. STANDARD OF REVIEW

We apply our independent judgment to questions of constitutional interpretation, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[24] When interpreting the constitution, we aim "to give effect to the intent and purpose of the framers of the constitutional provision and of the people who adopted it. Unless the context suggests otherwise, words are to be given their natural, obvious and ordinary meaning."[25]

## IV. DISCUSSION

Article XII, section 7, of the Alaska Constitution provides: "Membership in employee retirement systems of the State or its political subdivisions shall constitute a contractual relationship. Accrued benefits of these systems shall not be diminished or

---

[23]    (...continued)
to be filed within 10 days of the judgment's entry.

[24]    *Wilson v. State*, 478 P.3d 1217, 1221-22 (Alaska 2021) (alteration in original).

[25]    *Duncan v. Retired Pub. Emps. of Alaska, Inc.*, 71 P.3d 882, 886-87 (Alaska 2003) (quoting *Hammond v. Hoffbeck*, 627 P.2d 1052, 1056 n.7 (Alaska 1981)).

impaired." These benefits constitute "an element of the bargained-for consideration given in exchange for an employee's assumption and performance of the duties of his employment."[26] As a result, these rights vest as soon as the employee is employed and enrolled in the system, and "system benefits offered to retirees when an employee is first employed and as improved during the employee's tenure may not be 'diminished or impaired.' "[27] Modifications to vested benefits are permissible only if they do not diminish the benefits; new advantages to employees must offset new disadvantages, resulting in benefits of "equivalent value" to employees.[28] Whether the modification of a health insurance benefit is a diminishment is analyzed from the perspective of the group, rather than the individual circumstances of a particular benefit recipient.[29] And

---

[26]     *Metcalfe v. State*, 484 P.3d 93, 97 (Alaska 2021) (quoting *Hammond*, 627 P.2d at 1056).

[27]     *Duncan*, 71 P.3d at 886 (quoting Alaska Const. art. XII, § 7).

[28]     *Id.* at 892. Additionally, the alterations "must bear some material relation to the theory of" operating a successful system of benefit provision, and the added, offsetting advantage must "relate generally to the benefit that has been diminished." *Hammond*, 627 P.2d at 1057 (first quoting *Allen v. City of Long Beach*, 287 P.2d 765, 767 (Cal. 1955); and then quoting *Betts v. Bd. of Admin. of the Pub. Emps.' Ret. Sys.*, 582 P.2d 614, 618 (Cal. 1978)).

[29]     We adopted this group-based analysis of diminishment of health insurance benefits in *Duncan*. 71 P.3d at 891-92. But we qualified this holding with a caveat: An old plan — even if not a diminishment from the group perspective — should remain an option for individuals for whom the new plan would result in "a serious hardship that is not offset by comparable advantages," unless the State showed "a compelling need for the change and the impracticability of providing for" such a choice. *Id.* at 892. Neither party here has advocated for this half-measure on appeal. Therefore, we analyze the issue on appeal in group-based terms, rather than contemplating individualized or subset-based analysis.

this analysis must be supported by reliable evidence.[30]

The State argues that dental coverage for public retirees is not an "accrued benefit" protected by article XII, section 7 of the Alaska Constitution. And even if it is, the State argues, the court erred by refusing to consider changes in premium rates paid by enrollees in addition to the terms of coverage in its analysis, and thus erroneously concluded that the 2014 plan diminished the benefit.

We conclude that because the State held out the option to purchase its dental insurance plan to employees as part of their retirement benefits package, this option qualifies as an accrued benefit and is constitutionally protected from diminishment. But because the value of the option to purchase the plan is affected by both the plan's coverage and price to the purchaser, analysis of the option's value should incorporate both these dimensions. Therefore, by refusing to consider the reduction in premiums paid by enrolled retirees, the superior court applied an erroneous legal standard when concluding the State's redesign diminished the benefit's value.

A. **The Superior Court Correctly Determined The Alaska Constitution Protects The Option To Buy Dental Insurance As An Accrued Benefit For State Retirees.**

When determining whether the Alaska Constitution protects something as an "accrued benefit," we ask whether it is "an element of the consideration that the [S]tate contracts to tender in exchange for services rendered by the employee."[31] Article XII, section 7 uses the term "accrued benefits" without limitation, and our case law favors defining the term broadly:[32] We have previously determined that it

---

[30]    *Id.* at 892.

[31]    *Hammond*, 627 P.2d at 1059.

[32]    *Duncan*, 71 P.3d at 887.

encompasses medical insurance plans and death benefits payable to retirees' beneficiaries.[33] Accrued benefits incorporate "all retirement benefits that make up the retirement benefit package that becomes part of the contract of employment when the public employee is hired," including not only "dollar amounts" but also "the practical effect of the whole complex of provisions."[34]

The State contests the superior court's conclusion that retirees' DVA insurance plans qualify as accrued benefits. The court determined that "[a]lthough retirees self-fund their DVA coverage, the option to buy the insurance is still part of the benefit they are offered at the time of employment." Because the State decided to offer DVA coverage to its employees, the court reasoned, retirees "have [a] right to take advantage of that" option by purchasing DVA insurance based on the terms in existence when they were hired.

The State attempts to dismiss the superior court's analogy to an option contract by arguing that in contract law, "[t]o create an enforceable option, the terms must be clear and fixed — an offer to transfer a particular thing for a particular price at some time in the future." It claims that AS 39.30.090 creates only an illusory and unenforceable "agreement to agree" by authorizing the State to offer dental insurance without requiring it to do so. In contrast, the statute in *Duncan* — the case in which we held major medical insurance to be an accrued benefit — required the State to provide major medical insurance.[35] The State portrays the dental insurance plan as optional for

---

[33]     *Id.*; *Hammond*, 627 P.2d at 1059.

[34]     *Metcalfe v. State*, 484 P.3d 93, 97 (Alaska 2021).

[35]     *See Duncan*, 71 P.3d at 885 n.4, 888 ("Each person who is entitled to receive a monthly benefit from the retirement system *shall* be provided with major medical insurance coverage." (emphasis added) (quoting Ch. 200, §§ 1-2, SLA 1975)).

both the State and retirees, arguing it does not "accrue" unless or until retirees buy the coverage upon retirement. The State asserts that because members buy dental insurance by paying premiums instead of "earn[ing]" it by working, the dental insurance is not deferred compensation for their labor.

But this argument confuses the right promised as part of the initial employment contract — the option to purchase the dental insurance — with the employee's later exercise of that right — the actual purchase of the insurance.[36] The employees provided consideration for the option by assuming and performing the duties of their employment.[37] An employee's rights to retirement benefits "vest on employment and enrollment in the system," not "when an employee becomes eligible to receive those benefits" on retirement.[38]

When determining the scope of the anti-diminishment provision in *Duncan*, we looked not only to the statute requiring the State to provide medical insurance, but to "the various employee publications" which "promise[d] coverage."[39] Since 1979 the State has unequivocally chosen to offer PERS beneficiary recipients the option to participate in a DVA plan, with premiums paid by the recipients.

---

[36]   *Metcalfe*, 484 P.3d at 100 (dismissing the State's argument "that AS 39.35.350 was simply an offer to contract again in the future under specified terms . . . and that the offer could be revoked any time before it was accepted").

[37]   *See id.* ("[C]onsideration for that benefit, like every other benefit of the system, was simply the 'employee's assumption and performance of the duties of his [or her] employment.' " (alteration in original) (quoting *Hammond*, 627 P.2d at 1056)).

[38]   *Hammond*, 627 P.2d at 1055 (footnote omitted); *see also Metcalfe*, 484 P.3d at 100 ("[T]he State's 'offer' was irrevocable when the employee accepted State employment in objective reliance on the promise that conditional reinstatement . . . [was] among the benefits of enrollment in the system.").

[39]   71 P.3d at 889.

The State's previous communications to employees about the DVA plan consistently speak in terms of the recipients' "rights" to elect coverage and, once enrolled, their "rights" to future coverage. Regulations provide that failure to timely elect DVA insurance "will result in the loss of all rights to apply for or obtain [DVA] insurance under this chapter,"[40] and that a benefit recipient who fails to make premium payments "forfeits the right to participate in the [DVA] plan."[41] The 1979, 1984, 1985, and 1989 booklets all promise that the DVA coverage for recipients who elect to participate "will continue as long as [they] are eligible to receive a monthly benefit" from PERS and "the premiums are continuously paid" by the recipients. More recent booklets similarly assure readers that "[n]ew benefit recipients who elect coverage at retirement will be covered under this plan."

DVA booklets from 1991, 1998, 2000, and 2003 caution that "[t]hese benefits may change from time to time." The booklets nonetheless provide that coverage for a recipient will end only if the recipient fails to pay the premium, decides to discontinue participation, or becomes ineligible to receive PERS benefits in general. Another regulation alerts beneficiaries: "When necessary to maintain the financial integrity of the [DVA] plan, the administrator may change the premiums and the terms of coverage."[42] But it says nothing about the State reserving the right to modify the plan for any other reason, let alone to terminate the DVA program.

The State has thus long held out the option to purchase its DVA insurance plan as part of the package of retirement benefits tendered to public employees in

---

[40]    2 AAC 39.220(e).

[41]    2 AAC 39.240(b).

[42]    2 AAC 39.280.

exchange for their performance of services.[43] An option to purchase dental insurance in the future has value. Therefore, we conclude this option is an accrued benefit protected from diminishment by the Alaska Constitution.

**B.      The Superior Court Erred By Categorically Ignoring Premiums Paid By Retirees When Assessing The 2014 Dental Plan's Value.**

The State primarily argues that if the diminishment clause applies to the DVA plan, it "protects — at most — the opportunity to purchase a dental plan if one has been created by the State, not the details of coverage." But the State also insists that if the diminishment analysis nonetheless applies to the DVA plan's terms, "premiums must be part of the analysis" as well. It argues that "[p]rotecting the details of coverage without regard to the expense — as the superior court did — traps retirees in an upward spiral of premiums to pay for outdated coverage, ultimately dooming the plan to fail."

At the other extreme, RPEA portrays the terms of coverage as determinative but the premiums paid by retirees as irrelevant to the diminishment analysis. RPEA argues that the anti-diminishment provision "protects the details of a benefit that determine its value to the retiree, not just the general concept of the benefit." But RPEA simultaneously claims that premiums are irrelevant, interpreting this court's holding in *Duncan* as establishing "that the [C]onstitution protects coverage, not premiums." Agreeing with RPEA, the superior court read our holding in *Duncan* to mean "that the Alaska Constitution protects retirees' benefits, not the premium paid for the benefits," and declared that this "applies regardless of who pays the premium." The superior court thus considered the DVA coverage itself to be the accrued benefit protected by the

---

[43]      *See Duncan*, 71 P.3d at 888 (concluding that "accrued benefits," as a term, "includes all retirement benefits that make up the retirement benefit package that becomes part of the contract of employment when the public employee is hired").

Alaska Constitution, dismissing the price of the insurance plan paid by retirees as irrelevant to the diminishment analysis.

### 1. The coverage provided by the insurance plan is relevant to the diminishment analysis.

We reject the State's argument that the anti-diminishment provision protects only the right to purchase whatever dental insurance plan the State might offer, and conclude that the coverage terms are relevant to the value of that right.

The State bases its argument on the absence of any statute requiring it to create a dental plan, let alone one with any specific terms or provisions. But the State's pre-2014 communications to employees about their benefits package do not merely reference a vague, hypothetically worded opportunity to purchase whatever kind of dental plan the State might offer at an indeterminate time. Instead, they contain straightforward assurances that retiring employees will have the opportunity to purchase coverage under the DVA plan offered by the State, and then to continue that coverage as long as they pay the premiums. Some of the booklets caution that "[t]hese benefits may change from time to time," but this would technically be true for benefits protected from diminishment.[44]

One regulation does warn employees that, "[w]hen necessary to maintain the financial integrity of the [DVA] plan, the administrator may change the premiums and the terms of coverage."[45] But this language may well imply to the reader that the State's ability to modify the terms of the DVA plan is constrained to changes actually necessary to maintain the plan's financial integrity. And this regulation is in harmony

---

[44] *See id.* at 886 ("Reasonable modifications [to vested benefits] are permissible. But to be sustained as reasonable, changes that result in disadvantages to employees should be accompanied by comparable new advantages.").

[45] 2 AAC 39.280.

with an approach to the diminishment analysis that allows modifications "for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system."[46] This regulation may limit the extent of the DVA benefits' protection from diminishment, but does not render these benefits immune from the diminishment analysis.

Article XII, section 7 of the Alaska Constitution protects the specific value of an accrued benefit, not just the general concept of having a benefit instead of nothing. In *Hammond v. Hoffbeck* we stated that the vested rights protected by the anti-diminishment provision "necessarily include . . . the dollar amount of the benefits payable."[47] In *Sheffield v. Alaska Public Employees' Ass'n, Inc.* we held that early retirement benefits for an employee must be calculated using the actuarial table in effect when the employee began his employment rather than the less-advantageous one adopted later.[48] In *Flisock v. State, Division of Retirement & Benefits* we held the State was constitutionally required to use the specific method of calculating an employee's retirement benefits in effect when the employee was first employed and enrolled in the retirement system.[49]

Under the anti-diminishment provision, modifications to vested benefits are permissible only if new disadvantages to employees are offset by new advantages,

---

[46]     *Duncan*, 71 P.3d at 889 n.26 (quoting *Hammond v. Hoffbeck,* 627 P.2d 1052, 1057 (Alaska 1981)).

[47]     627 P.2d at 1058.

[48]     732 P.2d 1083, 1085-89 (Alaska 1987).

[49]     818 P.2d 640, 643-45 (Alaska 1991).

resulting in benefits of "equivalent value" to employees.[50] Value is the touchstone of this analysis. We conclude that when the accrued benefit in question is an option to purchase an insurance plan, the services covered by that plan are relevant to the benefit's value.

### 2. The price of purchasing the insurance plan to the retirees is also relevant to the diminishment analysis.

We reject RPEA's argument that the insurance premiums paid by retirees are irrelevant to the diminishment analysis. RPEA's argument and the superior court's reasoning on this point both ultimately rely on our statement in *Duncan* that the health insurance benefits themselves were protected, not the cost of the premiums paid by the State.[51] But the logic of *Duncan* does not compel the same conclusion here, where the retirees themselves pay the premiums.[52]

In *Duncan* the State argued the protected benefit was the premium paid by the public employer, rather than the coverage provided to the employee.[53] We disagreed for two reasons: First, "[t]he natural and ordinary meaning of 'benefits' in a health insurance context refers to the coverage provided rather than the cost of the insurance," and second, the State's publications to employees "promise[d] coverage, not merely payment of a particular premium."[54]

---

[50]     *Duncan*, 71 P.3d at 886, 892.

[51]     *See id.* at 892 ("[The] health insurance benefits are benefits protected by article XII, section 7, and . . . it is the benefits themselves . . . rather than the cost of the benefits . . . that receive constitutional protection.").

[52]     *See* AS 39.30.090(a)(10) ("[A] person electing to have insurance under this paragraph shall pay the cost of the insurance.").

[53]     71 P.3d at 888.

[54]     *Id.* at 889-90. One such employee handbook read: "Comprehensive major
(continued...)

The first of those reasons could apply here; ordinarily, the term "benefits" in the dental insurance context would mean coverage. But the second reason does not. In *Duncan* the State was paying the premiums,[55] so reducing them would have had no value to retirees. Here the retirees are paying the premiums, so reducing them would have clear value to the retirees. We did not proclaim premiums categorically irrelevant to diminishment in *Duncan*. Rather, we urged detailed analysis of "offsetting advantages and disadvantages" to determine whether a new plan had "equivalent value" compared to an old plan.[56]

We do not rigidly apply a single inflexible approach to assessing whether changes to retirement benefits are diminishments; rather, we adjust our assessment method to the circumstances and structure of the benefit at issue.[57] In *Duncan* we diverged from the individualized assessment approach we used in *Hammond*.[58] *Hammond* evaluated changes to fixed income streams, namely occupational disability

---

[54] (...continued) medical insurance coverage is provided . . . . There is no cost to you for this insurance." *Id.* at 885 n.5.

[55] *Id.* at 885, 888.

[56] *Id*. at 892.

[57] *See id.* at 892 ("[E]quivalent value must be proven by a comparison of benefits provided — merely comparing old and new premium costs does not establish equivalency."); *Hammond v. Hoffbeck*, 627 P.2d 1052, 1058 (Alaska 1981) ("[T]he vested benefits protected . . . necessarily include not only the dollar amount of the benefits payable, but the requirements for eligibility as well.").

[58] *See Duncan*, 71 P.3d at 891; *Hammond*, 627 P.2d at 1059 ("[A] determination of whether vested rights to benefits have been diminished must be made on a case-by-case basis.").

payments;[59] in contrast, *Duncan* evaluated changes to health insurance benefits, for which individual utilization fluctuates "according to the unpredictable, changing medical needs of each individual."[60] We reasoned that this difference rendered the individual assessment approach used in *Hammond* "generally inappropriate with respect to health insurance," and prescribed that health insurance changes be assessed instead from the standpoint of the group.[61]

Value is generally defined as "[t]he significance, desirability, or utility of something."[62] The price a person has to pay for an insurance plan is relevant to how desirable an option to buy into the plan is. A reasonable assessment of the value to retirees of an option to purchase dental insurance must include the price of that insurance to the retirees.

By insisting that price is irrelevant, RPEA urges us to mandate a constant quantum of coverage even if this necessitates skyrocketing premiums, arguing that "[r]etirees' protection against excessive premiums inheres in their right to discontinue participation in the DVA plan." But RPEA's argument would suggest that an option to purchase coverage at a bargain is equivalent in value to an option to purchase that same amount of coverage for an astronomical sum. If the State could keep coverage constant but needlessly increase premiums without diminishing the plan's value, the "protection" provided by retirees' ability to opt out would be illusory at best.

To the holder of an option contract, a lower purchase price is clearly an advantage. To retirees with an option to buy into an insurance plan, lower premiums are

---

[59] 627 P.2d at 1058.

[60] 71 P.3d at 891.

[61] *Id.*

[62] *Value*, BLACK'S LAW DICTIONARY (11th ed. 2019).

-22-                                                                      **7581**

also clearly an advantage. Thus, we hold that when premiums are paid by retirees, decreases in premiums should be considered relevant to the value of the benefit.

We ultimately conclude that because the State held out the option to purchase its DVA insurance plan to employees as part of their retirement benefits package, the Alaska Constitution protects this option from diminishment. And because this option's value is affected by both the plan's coverage and purchase price, analysis of its potential diminishment should incorporate both these dimensions. When determining that the State's 2014 plan was an unconstitutional diminishment, the superior court analyzed only whether coverage was diminished. Deeming premiums categorically irrelevant to the diminishment analysis, the court did not consider whether the premium decrease, alongside the few documented coverage increases, might have offset the disadvantages of the coverage decreases. We therefore hold that it was error to fail to consider the reduction in premiums paid by retirees as an advantage in the diminishment analysis.

The State additionally argues that the superior court erred by concluding the 2014 plan was a diminishment without support from reliable quantitative analysis. The superior court claimed to have "considered the magnitude of each change" to the plan benefits and "the number of members affected by the changes." But the superior court did not identify reliable evidence of the number or proportion of members affected by given changes, nor did RPEA provide such evidence.[63] RPEA's expert witness in plan evaluation essentially counted the number of services for which the redesign decreased or increased coverage, then compared the resulting totals; he did not consider how many or how often beneficiaries used any of the services, nor how much they paid

---

[63] The only indication to the contrary was the court's finding of a decrease in adult claims for fluoride following the 2014 plan's reduction in fluoride coverage. *See supra* note 20.

for them. And ultimately the superior court disclaimed any need to support its conclusion with quantitative or actuarial analysis.

We reiterate our admonishment in *Duncan* that a benefit's "value must be proven by reliable evidence. . . . [O]ffsetting advantages and disadvantages should be established under the group approach by solid, statistical data drawn from actual experience — including accepted actuarial sources — rather than by unsupported hypothetical projections."[64] As the plaintiff claiming a constitutional violation, RPEA has the burden to show that the plan's value has diminished.

The benefit in question here is the right to buy DVA coverage, at a price that covers the State's costs to provide the coverage, and both price and coverage are relevant in assessing plan value. Benefit value is to be judged from a group rather than an individual perspective,[65] including when evaluating cost-saving measures. The coverage itself need not be fixed; modifications that keep abreast of changing practices and preferences are expected.[66] Premium and coverage limits are permitted as needed to maintain plan integrity.[67] But as we admonished in *Duncan*: "Unusual gaps in coverage should be avoided. . . . [T]he coverage that is offered should generally be 'in

---

[64] *Duncan*, 71 P.3d at 892; *see also Hammond*, 627 P.2d at 1058 n.12 (dismissing as "speculative" the State's "hypothetical projections" of potential increases in benefits).

[65] *Duncan*, 71 P.3d at 884, 891.

[66] *See id.* at 891 ("[H]ealth insurance benefits must be allowed to change as health care evolves.").

[67] *See id.* at 889 n.26 (recognizing the need to make modifications "for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system" (quoting *Hammond,* 627 P.2d at1057)).

keeping with the mainstream' of health insurance packages offered to active public employees in terms of scope and balance."[68]

Given all these variables, it may be impossible to determine whether the modified plan here is more or less valuable than the plan it replaced. If that turns out to be the case, the court should look to whether the modification reflects a good faith effort by the State to continue providing a viable plan in keeping with mainstream DVA coverage for active public employees. This, at a minimum, is required by the prohibition on diminishment of benefits.

## V.  CONCLUSION

Because it was error to refuse to consider the reduction in premiums paid by retirees, we VACATE the superior court's judgment and REMAND for the new diminishment analysis using the correct legal standard. We thus also VACATE the superior court's post-judgment rulings awarding attorney's fees and costs and granting additional injunctive relief.

---

[68]    *Id.* at 892 (quoting *Studier v. Mich. Pub. Sch. Emps. Ret. Bd.*, No. 00-92435-AZ, slip op. at 20, 2001 WL 35980737 (Mich. Cir. Feb. 21, 2001)).

WINFREE, Justice, dissenting.

Today the court effectively holds that the legislature created *mandatory* group health insurance benefits for retired State employees and that, under the Alaska Constitution, these benefits may not be diminished at or during retirement. I respectfully disagree. In my view the legislature authorized the executive branch, *in its discretion*, to supplement mandatory health insurance benefits with group health (and other) insurance benefit programs for covered individuals' voluntary participation, *mandating only* that retirees be eligible to voluntarily participate in those group health insurance benefit programs at the retirees' own expense. The relevant statute cannot be read any other way. It is the legislature's prerogative to authorize discretionary benefit programs for retirees who voluntarily choose to participate in those benefit programs. It is not the court's prerogative to change discretionary retiree benefit programs into mandatory retiree benefit programs.

The constitutionally protected retirement benefit in this context is the right to participate — voluntarily and at a retiree's sole expense — in group health insurance programs that the State, in its discretion, establishes and maintains for employees, retirees, and other statutorily designated individuals. A retiree has no constitutionally protected contract rights requiring the State to maintain a discretionary group health insurance program, a particular group health insurance benefit level that may have been in place in years past, or a particular group health insurance premium level that may have been in place in years past.

I therefore dissent.